CITY AND COUNTY OF DENVER, a Municipal corporation of the State of Colorado, on behalf of itself and all other public bodies in the State of Colorado, similarly situated, Plaintiff,

v.

The AMERICAN OIL COMPANY et al., Defendants.

Civ. A. No. C–2365.

United States District Court,
D. Colorado.

Oct. 28, 1971.

Max P. Zall, City Atty., Brenman, Ciancio, Rossman, Baum & Sobol by Leo T. Zuckerman and Arthur L. Fine, Denver, Colo., Friedman, Koven, Shapiro, Salzman, Koenigsberg, Specks & Homer by Granvil I. Specks, Josef D. Cooper, Perry Goldberg and Robert Joseph, Chicago, Ill., for plaintiff.

Hodges, Harrington, Kerwn & Otten by Joseph G. Hodges, Denver, Colo., M. J. Keating, Chicago, Ill., for defendant, the American Oil Co.

Nielsen, Conder, Hansen & Henroid by Arthur H. Nielsen, Salt Lake City, Utah, Karl F. Anuta, Denver, Colo., Donald L. Jensen, Cody, Wyo., for defendants, Blackline Asphalt Sales, Inc., and Husky Oil Co. of Del.

Ireland, Stapleton, Pryor & Holmes by Robert C. Hawley, William C. Jensen and C. Reed Guthridge, William V. Cox, Denver, Colo., Bruce R. Merrill and David M. Francis, Houston, Tex., for defendant, Continental Oil Co.

James W. Campbell and Milas C. Bradford, Jr., Denver, Colo., William C. Weitzel, Jr., and Robert F. McGinnis, New York City, for defendant, Texaco, Inc.

Howrey, Simon, Baker & Murchison by Edward F. Howrey, A. Duncan Whitaker and John Kingdon, Washington, D. C., Burns H. Errebo, Denver, Colo., Charles F. Rice, New York City, for defendant, Mobil Oil Corp.

## MEMORANDUM OPINION AND CLASS ACTION DETERMINATION

WINNER, District Judge.

In its complaint, plaintiff charges defendants with a conspiracy to fix prices in the sale of asphalt in violation of the Sherman Act [15 U.S.C. § 1]. The complaint alleges that plaintiff, a municipal corporation, "has purchased, directly and indirectly, asphalt," and that it "brings this action pursuant to Rule 23, Federal Rules of Civil Procedure, as a class action on its own behalf and as the representative of the class of all governmental purchasers of asphalt . . . in the State of Colorado."

At a preliminary hearing, the Court requested a more precise definition of the class the city asks to represent, and in response to that request, plaintiff said that the class consists of:

"The State of Colorado, its departments, agencies, commissions and institutions, all counties within the State, and all cities and towns within the state, incorporated and unincorporated, with populations of 2,500 or more (according to the 1970 Federal census) which purchased directly or indirectly, asphalt (as defined in paragraph 12 of the complaint) during the period in suit."

Even with the added specificity of the class definition, uncertainty remained as to the exact number of class members. In response to the Court's request to define the class with precision, plaintiff advised that the class numbered 116. Later, this number was changed to 126, and by last count there are 126 governmental agencies to be included in the proposed class, although who has authority to speak for the unincorporated communities is not exactly clear. The period in suit is also somewhat uncertain, but it is said to be "for many years last past, the exact dates being unknown to the plaintiff, and continuing there-

after at least to the date of the filing of this complaint."

Rule 23(c) (1) commands:

"As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

It is this determination which is before the Court, and the prodigious number of class actions presently being filed in this and all other federal courts with their inevitable concomitant problems of judicial administration require that careful thought be given to the determination which must be made.

Rule 23 was totally rewritten in 1966, and an abundance of lower court decisions interpreting the rule has resulted, albeit those decisions reach differing results, dependent, perhaps, on the individual judge's views as to the underlying intent and purposes of the relatively new class action rule. Rule 23 provides:

"(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

Before we zero in on the controlling problems in this case, we should review the Advisory Committee note explaining the reasons for amending the rule and the purposes intended, and we should review some of the cases passing on class actions in antitrust litigation

which are not concerned with the passing-on defense, which, as we shall see presently, is a real problem here.

The Advisory Committee listed these difficulties with the old rule: (1) The confusion arising from "true," "spurious," and "hybrid," class actions should be eliminated; (2) the description of rights as being "joint," "common," or "secondary," was obscure and uncertain, and caused difficulty for the courts; (3) the rule did not provide an adequate guide to the proper extent of a judgment; and (4) the rule did not address itself to the question of the measures that might be taken during the course of the action to assure procedural fairness—particularly with reference to the notice provisions. The Committee commented:

> "The amended rule describes in more practical terms the occasions for maintaining class actions; provides that all class actions maintained to the end as such will result in judgments including those whom the court finds to be members of the class, whether or not the judgment is favorable to the class; and refers to the measures which can be taken to assure the fair conduct of these actions."

The Committee note to Rule 23 is long, and it should be studied in its entirety to ascertain the Committee philosophy supporting its recommendations. Here, we are chiefly concerned with the provision of Rule 23(a) that requires a finding that "the class is so numerous that joinder of all members is impracticable," and with the provisions of Rule 23(b) (3) saying that before a court determines that an action should be maintained as a class action, it must appear "that the questions of law or fact common to the members of the class *predominate over any questions affecting only individual members,* and that a class action *is superior to other available methods* for the fair and efficient adjudication of the controversy."

The Committee made no particular comment with reference to the question of practicability of joinder, but as to the matters of the predominance of common questions of law and fact, and the superiority of a class action the Committee commented at some length:

> "Subdivision (b) (3). In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b) (3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

> "The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed. . . . A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of dam-

ages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. . . . Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. . . .

"That common questions predominate is not itself sufficient to justify a class action under subdivision (b) (3), for another method of handling the litigious situation may be available which has greater practical advantages."

Although amended Rule 23 is but three months more than five years old, its interpretation has given rise to a startling number of cases and has resulted in three full annotations of particularized types of class action cases. See: Propriety, under Rules 23(a) and 23(b) of Federal Rules of Civil Procedure, as amended in 1966, (1) of class action for violation of federal antitrust laws [6 A.L.R.Fed. 19]; (2) of class action seeking relief against pollution of environment [7 A.L.R.Fed. 907]; (3) of class action seeking relief from racial discrimination [8 A.L.R.Fed. 461] and (4) of class action for violation of federal securities laws [9 A.L.R.Fed. 118].

Manifestly, it is the first of the above mentioned annotations which is most important here, and before we discuss some of the cases themselves we note parts of the editorial comments of the annotator. It is said in 6 A.L.R.Fed. 24:

"An antitrust class action not only must satisfy all four of the prerequisites ennumerated in Rule 23(a), but also must fall within one of the three subdivisions of Rule 23(b). . . . Despite the numerous different requirements which must be met, some

courts have emphasized that Rule 23 is to be construed liberally in favor of class actions, and a substantial majority of the cases have held that under the circumstances antitrust class actions were maintainable under Rule 23(a) and Rule 23(b). . . . Although there have been a few antitrust cases in which the size of the purported class was very small or in which special circumstances indicated that joinder would be practicable even for a large class, the courts have generally concluded that an antitrust class action satisfied the requirement of Rule 23(a) (1) that the class be so numerous that joinder of all members is impracticable. . . .

"Under Rule 23(b) (3), the first prerequisite to the maintenance of a class action is that the court find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. Although it has occasionally been held that the common questions in an antitrust class action were not predominate, most antitrust cases have held that the common questions ere predominate.

"Under Rule 23(b) (3), the second prerequisite to the maintenance of a class action is that the court find that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Although a few antitrust cases have held that a class action was not superior to other available methods of adjudication, numerous antitrust cases have held that a class action was superior to other methods of adjudication."

The annotator notes that under varying situations the following cases held that joinder was not practicable: Philadelphia Electric Co. v. Anaconda American Brass Co. (1968 D.C.Pa.) 43 F.R.D. 452; Illinois v. Harper & Row Publishers, Inc. (1969 D.C.Ill.) 301 F.Supp. 484; Research Corp. v. Pfister Asso-

ciated Growers, Inc. (1969 D.C.Ill.) 301 F.Supp. 497; Contract Buyers League v. F & F Invest. (1969 D.C.Ill.) 48 F.R.D. 7; Iowa v. Union Asphalt and Roadoils, Inc. (1968 D.C.Iowa) 281 F.Supp. 391 [a case with many factual similarities to this case]; Minnesota v. United States Steel Corp. (1968 D.C.Minn.) 44 F.R.D. 559 [a case which together with a reversal by the Eighth Circuit of a trial court order which is reported in 438 F.2d 1380, is discussed later in this opinion]; Siegel v. Chicken Delight (1967 D.C. Calif.) 271 F.Supp. 722 and Eisen v. Carlisle & Jacquelin (1968 2d Cir.) 391 F.2d 555. The finding that joinder was not practicable in these cases was based upon a showing that the number of members in the proposed class was much larger than the 126 potential class members last suggested by plaintiff here, and, in fact, the number ranged upward to 3,750,000 potential class members in *Eisen.*

William Goldman Theatres, Inc. v. Paramount Film Distributing Corp. (1969 D.C.Pa.) 49 F.R.D. 35, holds that there was an insufficient showing of the lack of practicability of joinder where the claimed class consisted of 460 motion picture theaters in cities of over 100,000 population. However, this holding was based in part upon a determination that many owners owned more than one theater and upon the fact that plaintiff did not allege in his complaint that the same bidding practices were used in other cities. The court concluded that upon the record made the probability was that the number of theater owners who wished to participate in the litigation was quite small, and that joinder was entirely practicable.

Holly Springs Funeral Home, Inc. v. United Funeral Service, Inc. (1969 D.C. Miss.) 303 F.Supp. 128, held that joinder was practicable and that there was no reason to create a class where it appeared that only 10 or 12 funeral homes were involved. State of Utah, on behalf of itself and all others similarly situated v. American Pipe and Construction Company et al., (1969 D.C.C.D.Calif.) 49 F.R.D 17, is deserving of careful study. Judge Pence mentioned in his opinion that he was possessed of long experience in antitrust cases brought against concrete pipe manufacturers, and that his ruling was based in large part on that experience. That Section 1 Sherman Act case asked that a class be created consisting of Public bodies and agencies in the states of Utah, Wyoming, Nevada and Idaho who were end users of concrete pipe. In refusing to determine that the action should be maintained as a class action, Judge Pence said:

"Appended to plaintiff's memorandum in support of its class action allegations is a list of what this court can only determine to be every incorporated whistle-stop, hamlet, village, town, city, county, and water and sewer improvement district in Utah, Nevada, Wyoming and Idaho. The several collections of whistle-stops, etc., total some 300 for Utah, 240 for Idaho, 270 for Wyoming, and 31 for Nevada. Plaintiff did not represent that each was actually an end user of pipe—plaintiff just made a list.

[The opinion then discusses the vast experience of Judge Pence in the concrete antitrust cases.]

"It is with the above background that the court here approaches the threshold problem facing every court in all Rule 23(b) (3), F.R.Civ.P., problems, viz.: 'As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained.'

"The complaint, on its face (even though its allegations but narrowly escape violating the minimum requirements of Rule 23(b), in that it barely goes beyond repetition of the language of the Rule, (see, Gillibeau v. City of Richmond, et al, Ninth Circuit, 417 F.2d 426 (1969)), when considered with the list of some 800 inferentially potential plaintiffs referred to above,

would appear, superficially, to meet the first prerequisite under Rule 23 (a) viz., that the class is so numerous that joinder of all members is impracticable—but more of that hereafter.

. . . . . .

"What *is* fatal to plaintiffs' class action allegations are the raw facts of the past five years litigation on almost precisely the same facts and problems of law set forth in plaintiffs' complaint, and this prior litigation is a criteria which this court must consider in resolving the 'threshold problem.' Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2 Cir. 1968).

"At the time the various 'class actions' were heretofore filed in the various states, as previously indicated they were 'spurious class actions,' thereby necessitating joinder. Suit and complaint notice was given to public bodies throughout the states of Hawaii, California, Oregon and Washington by the several attorneys general to all potential plaintiffs in those several states. The end result of such notices was that thereafter there was a joinder of all public bodies which had claims against the several 'western pipe' defendants. This court had no difficulty whatsoever in handling the conjoined problems of members of the so-called classes.

"Therefore, although here plaintiffs have alleged that the class is so numerous that joinder of all the 800 listed potential members is impracticable, this court cannot accept that numerical list as in any way truly representative of the number of public bodies in the several states who were actually affected by the alleged conspiracy—nor is it so alleged. Based upon population and population expansion in those states over the past twenty years, the court could take judicial notice that the number of end users in Hawaii, Arizona, California, Washington and Oregon should at least be more than seven times as many as the total number of end users in the four states named in the present 'class.' In any event, the court can but conclude that the number of public entities in Utah, Wyoming, Nevada and Idaho who might have been injured by the alleged conspiracy could not possibly exceed the 350 cases heretofore filed by end users in the other states of the 'Western Area.' From prior actual experience in like cases involving the same alleged conspiracy, this court could not find that number so numerous that joinder of all members was impracticable, nor can it conclude. that a class action here would achieve economies of time, effort and expenses or promote any more uniformity of decision than the joinder method heretofore proved successful. To the contrary, the fact of joinder and intervention has made the determination of actual parties plaintiffs and defendants, as well as the percentage of damage determination, much simpler, easier and more practicable than would have been any class action procedure under the present Rule 23(b) (3).

"The court therefore finds that the first prerequisites to a class action have not and cannot here be met."

■ This Court has not had the long experience of Judge Pence in antitrust class actions, but the Court respects his experience and is persuaded by his reasoning. Moreover, the Court has had experience in class actions other than antitrust, and is aware of the complex problems which have arisen in those cases, including, of course, problems of settlement stemming from the provisions of Rule 23(e), to say nothing of other settlement problems which may arise. See, State of Oklahoma, ex rel. Wilson v. Blankenship, Attorney General, et al., (1971) (10 Cir.) 447 F.2d 687, where the Oklahoma Attorney General finds himself a defendant in a multi-million dollar lawsuit because he settled an antitrust judgment in favor of the state which, coincidentally, was based on price

fixing in the sale of asphalt. Moreover, it will be remembered that the complaint and the class definition both refer to governmental bodies which have purchased asphalt *directly and indirectly* from the defendants. As will be discussed at some length later, the Court believes that the liability questions—both factual and legal—differ materially between direct and indirect purchasers, and the Court predicts that less than 10 of the claimed 126 class members will prove to be direct purchasers. Certainly, joinder of that number of plaintiffs is practicable, and beyond peradventure, if the number of direct purchasers does not exceed 10, joinder is to be preferred to a class action at least as to the direct purchasers. When we look at the indirect purchasers, although the limitation in the complaint to cities and towns with populations of 2,500 or more probably escapes the "whistle-stop" description of Judge Pence, the Court cannot help but know that the asphalt purchases of some of the smaller counties, cities and towns were of quantities of liquid asphalt which were so small that even if plaintiff is successful in the action and even if treble damages should be awarded in a class action to those small counties, cities and towns, the discovery expense to which they would be subjected would mean that they would wind up in the hole if they participated in the class action. The Court is not unaware of the fact that these small counties, cities and towns can opt out of the case under the provisions of Rule 23(c) (2), but the Court believes that it is more practicable to permit them to opt in under the procedures which will be outlined later in this opinion.

The Court recognizes that many decisions take a very liberal approach to class actions—an approach which well may be inconsistent with the comments here made. The reasoning of Chief Judge Augelli in City of Philadelphia v. American Oil Company (1971) (D.C. N.J.) 53 F.R.D. 45 is indeed persuasive,

but it is not deemed applicable to this case. There, the alleged Sherman Act violation concerns gasoline, and the initial class action problem was the exact opposite of the problem here. The problem was numerosity in the sense that defendants said that the classes would be so large that they would be unmanageable, while in our case defendants take the opposite tack and say that the number of entities involved is so small that there is no reason to create a class. Nevertheless, mention of those *American Oil Cases* should be made because of the very thorough review of the many class action cases made in Chief Judge Augelli's opinion. In those *American Oil Cases* it was held, (a) a class consisting of all state and municipal governments, governmental agencies, authorities, commissions and subdivisions in a 3-state area was a proper class; (b) a class consisting of less than 1,000 taxi companies was a proper class; (c) all industrial and commercial users who purchased in tank wagon quantities (approximately 10,000) was a proper class, but (d) all ultimate consumers (several million unidentifiable persons) would be an unmanageable class. After summarizing many of the cases on the subject, Chief Judge Augelli said:

"From these cases and other relevant precedent this Court can draw certain conclusions with respect to how the requirements for class certification under Rule 23 should be interpreted. The issues of liability can be separated from questions of individual damage when deciding if common issues of fact and law predominate over individual questions. (citations omitted). In price-fixing antitrust cases the issues of impact of the conspiracy and damages become one and the same since the amount of damages measures the impact of the illegal conspiracy. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968) [88 S.Ct. 2224, 20 L.Ed.2d 1231;] In re

Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions (Consumer Class Actions) (1971) (S.D.N.Y.) 333 F.Supp. 278

.    .    .    .    .    .

"This Court is of the opinion that in each of the consumer actions pending here, common questions of law and fact predominate over individual questions. As seen from the cited cases, the predominance requirement is met if there is one underlying conspiracy alleged to have affected all members of the class and damages are ascertainable on a general level. Defendants' argument concerning the individual questions raised by the alleged conspiracy centers not on the issue of whether or not such a conspiracy existed but rather upon what effect that conspiracy, if it existed, had upon the ultimate users of gasoline."

■ Study of the many decisions serves to convince that it is the general rule that in many antitrust actions the predominate question is the proof of a conspiracy, and the damage issues can and should be separated for individual determination. However, only a few cases consider the impact of Hanover Shoe, Inc. v. United Shoe Machinery Corp. (1968) 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231, on this general rule, and almost none of the cases face up to the *Hanover Shoe* problem at this early stage of the case; i. e., in determining whether the case should be maintained as a class action. We think that the time to recognize the problem is now—not down the road after the parties have completed their discovery and after the case is ready for trial. Unless and until the effect of *Hanover Shoe* on the litigation is determined, a court should make haste slowly in creating the morass of a class action which may have to be undone later to avoid an unmanageable jury trial. If the court lunges into a class action, only to learn later that the gut issues of the case are those going to liability rather than to damages, a

disservice has been done to the parties and to the economy of judicial time. If the issues as to liability differ from proposed class member to proposed class member, there should be no class, because, then, the predominance of common factual and legal issues test is not met. Under those circumstances, the case is squarely within the comments of the advisory Committee saying that a class action should not be permitted where there are material differences between members of the proposed class going to liability, and we think that it is for this reason that the Committee spelled out that some antitrust actions may be proper class actions and some may not be.

In approaching a discussion of *Hanover Shoe*, we should remind once more that the complaint says that plaintiff itself purchased both directly and indirectly from the defendants, and that on oral argument it was acknowledged that most members of the class purchased only indirectly. In Hanover Shoe, Inc. v. United Shoe Machinery Corp. (1968) 392 U.S. 481, 88 S.Ct. 2224, the situation presented to the Court was the reverse of that which we have before us. In that case, the violation was of Section 2 of the Sherman Act, and United Shoe Machinery Corp. was held to be guilty of a monopoly. "The District Court found that Hanover would have bought rather than leased from United had it been given the opportunity to do so. The District Court determined that if United had sold its important machines, the cost to Hanover would have been less than the rental paid for leasing the same machines. This difference in cost, trebled, [was] the judgment awarded to Hanover in the District Court."

Justice White stated the liability question as:

"United claims * * * that Hanover suffered no legally cognizable injury, contending that the illegal overcharge during the damage period was reflected in the price charged for shoes sold

by Hanover to its customers and that Hanover, if it had bought machines at lower prices, would have charged less and made no more profit than it made by leasing. At the very least, United urges, the District Court should have determined on the evidence offered whether these contentions were correct. The Court of Appeals, like the District Court, rejected this assertion of the so-called 'passing-on' defense, and we affirm that judgment."

In affirming, Justice White said:

"If in the face of the overcharge the buyer does nothing and absorbs the loss, he is entitled to treble damages. This much seems conceded. The reason is that he has paid more than he should and his property has been illegally diminished, for had the price paid been lower his profits would have been higher. It is also clear that if the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less. We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower. Fundamentally, this is the view stated by Mr. Justice Holmes in Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906), where Atlanta sued the defendants for treble damages for antitrust violations in connection with the city's purchases of pipe for its water works system. The Court affirmed a judgment in favor of the city for an amount measured by the difference be-

tween the price paid and what the market for fair price would have been had the sellers not combined, the Court saying that the city 'was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property.' The same approach was evident in Thomsen v. Cayser (1917) 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597, another treble-damage antitrust case. With respect to overcharge cases arising under the transportation laws, similar views were expressed by Mr. Justice Holmes in Southern Pacific Co. v. Darnell-Taenzer Lumber Co. (1918) 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451, and by Mr. Justice Brandeis in Adams v. Mills (1932) 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184. In those cases the possibility that plaintiffs had recouped the overcharges from their customers was held irrelevant in assessing damages."

In Footnote 8 at page 490 of 392 U.S., 88 S.Ct at page 2230, Justice White said:

"Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451, involved an action for reparations brought by shippers against a railroad. The shippers alleged exaction of an unreasonably high rate. To the claim that the shippers should not recover because they were able to pass on to their customers the damage they sustained by paying the charge, the Court said that the answer was not difficult:

"'The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss. The plaintiffs suffered losses to the amount of the verdict when they paid. Their claim accrued at once in the theory of the law as it does not

inquire into later events. . . . *The carrier ought not to be allowed to retain his illegal profit, and the only one who can take it from him is the one that alone was in relation with him, and from whom the carrier took the sum.'* "

We can read Justice White's opinion only to mean that the reverse effect of the Court's ruling on the availability of the "passing-on" defense is that ordinarily there must be privity between the plaintiff and at least one of the defendants. That is surely what Justice Holmes said in Southern Pacific Co. v. Darnell-Taenzer—"The carrier ought not to be allowed to retain his illegal profit, and *the only one* who can take it from him is the one that alone was in relation with him, and *from whom* the carrier took the sum." If, as is surely the law under *Hanover Shoe*, the original purchaser can recover treble damages even though he passed on the illegal charge, to permit others farther down the merchandising chain also to recover would subject a defendant to double liability trebled. Moreover, exactly how the damages of the second or third or fourth purchaser down the chain would be determined is a problem no court would care to face. By way of illustration, suppose that the manufacturer unlawfully added $100 to his price; that the first person in the distributive chain added that same $100 plus a 20% profit to the price; that the second person in the chain added the same $100 plus the first 20% profit and plus a 20% profit of his own; that the third person did the same thing and that the plaintiff purchased from the third member of the chain. How much could he recover from the manufacturer—the only guilty person? How should or could a court or a jury possibly figure out the damages when the facts on trial could not be as precise as those given in the illustration?

Or, let us assume that the steel companies have engaged in a price fixing conspiracy which raised the price of steel $5.00 per ton. Would anyone be so bold as to suggest that a purchaser of an automobile would have standing to bring an antitrust action against the steel companies, either for himself or in behalf of some massive class? There has to be a cutoff somewhere, and we think that *Hanover Shoe* coupled with the cases it cites make the cutoff point that of privity of contract between wrongdoer and original victim, unless the "cost-plus" exception discussed by Justice White can be shown. He said:

"We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present."

Under those same limited exceptions privity would not be required in the reverse application of "passing-on," because where there was, for example, a "cost-plus" contract, the damage problems would not exist, and there would be no logical reason for saying that purchaser number three in the chain of distribution could not recover. If the "passing-on" defense is available to a defendant, he would be excused from liability to the first purchaser, and there would be no risk of double liability trebled, but if that defense is not available, to permit recovery by one who bought only indirectly would subject the manufacturer to possible multiple liability trebled, and this we think goes beyond the policy of Congress in enacting the antitrust laws.

Although we are probably recognizing the "pass-on" problem earlier in this case than have other courts, we are not the first court to tussle with *Hanover Shoe* in antitrust class actions. State of West Virginia v. Chas. Pfizer & Co., Inc. (1971) (2d Cir.) 440 F.2d 1079, was before the Second Circuit on an ap-

peal from a settlement approved by the lower court. The Court said:

"The most interesting and difficult issue which this appeal presents is the use of the 'passing-on' doctrine as regards the claims of the wholesalers and retailers, not as a defense to escape liability, as is normally the case, but rather as a basis for determining the distribution of the damages recovered among various plaintiffs."

The Court then quoted from the findings of Judge Wyatt and from *Hanover Shoe*. Although there is language in the case which may run contrary to our conclusions, the ultimate holding of the case is that it fell within the "cost-plus" exception mentioned by Justice White. The Second Circuit held:

"In *Hanover Shoe* itself Justice White placed strong emphasis on the Court's desire to encourage private treble damage actions.

" 'These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the imporance of which the Court has many times emphasized would be substantially reduced in effectiveness.'

"Keeping these comments in mind, there are then several obvious distinctions between the principles laid down in *Hanover Shoe* and the present case. First, the passing-on doctrine is not here being used as a defense to permit the defendants to escape liability, but rather as an attempt to award damages, insofar as is possible, to those who ultimately paid higher prices as a result of the collusive pricing, and to avoid giving a windfall gain to those who rather clearly were

not injured. Secondly, to permit the use of the doctrine in the present circumstances will not act to limit or frustrate private treble-damage claims, but will, if anything, do the opposite. . . .

"Finally, the *Hanover Shoe Court* itself indicated, as quoted above, that it might well be willing to recognize, in the limited situation where the initial purchaser of the collusively priced goods resold them on a 'cost-plus' basis 'thus making it easy to prove that he has not been damaged . . . [that] the considerations requiring the passing-on defense not be permitted in this case would not be present.' The record below makes it clear that the arrangements under which the wholesalers and retailers resold these products were, in virtually all cases, cost plus a set percentage markup. . . . Judge Wyatt therefore concluded:

" 'Here the antibiotics in dosage form (capsules, tablets, or other forms) were resold just as obtained from defendants. Nothing was added or changed. The mark-up was applied to the cost and the resultant price was collected from the consumer. The higher the cost, the higher the mark-up, and the higher the profit to the members of this [wholesaler-retailer] class. The situation here seems much like the " 'cost-plus' contract" referred to in the Hanover opinion.' "

Judge Miles Lord held in In Re Coordinated Pretrial Proceedings in Antibiotics Antitrust Actions, M 19–93A, Southern District of New York [unreported] 333 F.Supp. 313:

"The main thrust of defendants' argument seems to be that since the Hanover Shoe doctrine precludes use of a 'pass-on' defense against a seller in a chain of distribution *unless* the sale was pursuant to a 'cost plus' or other fixed markup arrangement, a subsequent purchaser in the chain of distribution is too remote or lacks standing unless he purchased under a 'cost

plus' type contract. [Judge Lord then quoted from State of West Virginia v. Chas. Pfizer & Co. Inc., supra.]

"Courts and commentators have both confessed an inability to reconcile the standing and remoteness cases. The Eighth Circuit recognizing the interrelationship between 'remoteness' and 'pass-on' recently concluded that one should not be decided without the other and that 'judicial resolution of these complex issues must await the ripe adjudication of the factual context in which they arise.' State of Minnesota v. United States Steel Corp. (1971) 438 F.2d 1380.

"This court believes that the resolution of the standing/remoteness/pass-on issues as they relate to this litigation must also await further development of the *factual context in which they arise.*"

■ We do not disagree that the ultimate decision as to the standing/remoteness/pass-on issues must await development of the facts, but we believe that at least where the apparent facts are such as here exist, the factual differences among potential class members—differences affecting liability—should be recognized before a case is determined to be a class action. As we have seen, in the *Antibiotics Cases*, the Second Circuit held that the pricing structure could be analogized to a cost-plus situation, but common sense dictates that that result cannot ensue here. The asphalt here was in most instances but a material included in an overall contractor's bid, and with perhaps some few exceptions, there is little chance that the cost-plus analogy can be drawn here. Appropriate use of the discovery procedures should establish the essential facts as to the passing-on of the alleged improper charges, and the issue as to most potential class members may well become ripe for decision on motion for summary judgment. If a class action were to be determined to be appropriate at this time, the summary judgment route will

be effectively barricaded before the Court has a fair chance to look at a problem which may be dispositive of the case as to many members of the proposed class.

The passing-on question arose in a somewhat unusual context in State of Minnesota v. United States Steel Corporation (1969) (D.C.Minn.) 299 F.Supp. 596. Defendants submitted an interrogatory to plaintiffs seeking to ascertain the amount of funds made available to plaintiffs by grants-in-aid from the United States for portions of construction projects. Plaintiffs objected to the interrogatory on the ground that the requested information had no relevance because, as said by Judge Neville:

"Plaintiffs state that the issue before the court is essentially a question of standing; that is, where should the court draw the line as to who is the proper party and thus has standing to sue in a situation such as presents itself in the case at bar. * * *

"Defendants' purpose (in submitting the interrogatory) obviously is to limit the ultimate recovery by claimants, if any there be. The court believes that it is presented with a question of law and that resolution thereof is proper at this time."

The opinion discusses the applicability of *Hanover Shoe* to the problem and it was said:

"The action of the Supreme Court in *Hanover Shoe* in denying the passing-on defense was consistent with the earlier lower court decisions denying the passing-on defense in the *Electrical cases*. These cases involved treble-damage actions by public utility companies who had purchased steam turbine generators at an allegedly illegally inflated price due to a price fixing conspiracy on the part of defendants. The *Atlantic City Electric* [Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59] case arose over objections to interrogatories where the defendants attempted to show that the

higher prices paid for the generators had been passed on to plaintiff's customers through higher rates fixed on a larger rate base. Judge Feinberg held that such evidence would be inadmissible as a matter of law and sustained plaintiff's objections to defendants' passing-on interrogatories. In a thorough analysis of the law of passing-on, the court first noted that earlier Supreme Court opinions had indicated that the passing on of an illegal overcharge was no bar to recovery. The court did recognize that the *Oil Jobber Cases* in the Seventh and Eighth Circuits had allowed a passing-on defense, but thought these cases were distinguishable, and, in any event were 'inconsistent with what appears to be more compelling authority.' The court concluded that strong policy reasons dictated a denial of the passing-on defense. . . .

"The court does not believe that federal reimbursement programs to the state under various grants-in-aid and loan programs can be analogized to the cost-plus contract situation referred to in *Hanover Shoe.* Of overall significance is the fact that federal reimbursements are not typical of the normal passing-on situation where the inflated price is passed on to plaintiff's customers. This case presents suits by state governmental claimants operating on a non-profit basis. Therefore any attempt to analyze the problem in terms of the impact on plaintiffs' profits would be misplaced. Secondly, the typical passing-on situation involves a sale, a resale, and an overcharge passed on to plaintiff's customers.

. . . . . .

"plaintiff's objections to Interrogatory 6 . . . will be sustained."

An interlocutory appeal of Minnesota v. United States Steel Corporation was allowed, and the lower court decision was reversed by the Eighth Circuit in Minnesota v. United States Steel Corporation (8 Cir. 1971) 438 F.2d 1380. On appeal it was argued that the case came within the "cost-plus" exception of *Hanover Shoe,* but the court held that the extent to which the illegal price was passed on and the method by which it was passed on was a question to be resolved after all of the facts were ascertained. It was held:

"The evidentiary details concerning the supply contracts between the steel companies and the contractors and the corresponding construction contracts between the states and the contractors are not in the present record. The extent to which the contractors passed-on any illegal prices to the claimant states is not disclosed. The issues presented here depend on the initial determination as to whether, in light of the principles of Hanover, supra, and the earlier cases which preceded it, the damage item *could have been asserted only by the contractors* or was in fact passed-on by them to the respective states. Decision of the basic questions presented would require us to proceed on the assumption of fact that the damage asserted was passed on to the states, whereas the stipulated facts for appeal make resolution of that matter equivocal at best. On the surface the issue as to whether the states have passed-on the illegal price to the federal government may seem severable, but on close analysis we deem it so interrelated with the issue as to whether the contractors passed-on the damages to the states that we feel the one should not be answered without the other.

"Even within a complete factual record the legal issues involved are not simply resolved. The basic problem is overlapped by the considerations of the law of standing, conceivably real party in interest questions, the collateral source doctrine, issues concerning treble as opposed to single damages, causation, the relationship of the state and federal governments under the

provisions of the highway grant-in-aid program, as well as a proper interpretation of *Hanover*. We feel that judicial resolution of these complex issues must await the ripe adjudication of the factual context in which they arise."

■ If State of Minnesota v. United States Steel Corp., supra, establishes nothing else, it surely demonstrates the improbability that common questions of law and fact will predominate in a class action such as the one we are today considering. Whether the passing-on rule precludes recovery by a particular plaintiff is a question of liability to that plaintiff—not just a question as to the dollar amounts which may be due that plaintiff. Of course, a determination that no plaintiff is barred from recovery, no matter what the facts may be as to passing-on, would solve the problem, but such a conclusion appears to be most unlikely under the present state of the law. Once more, we agree that the question should be determined after full development of the facts, but if we understand the spirit and intent of Rule 23 and the Advisory Committee note, the separate liability determinations as to each plaintiff should be made apart from the inevitable complications stemming from class actions.

The Eighth Circuit noted in Minnesota v. United States Steel Corporation, supra, the above opinion of Judge John Lord in Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corporation (1970) (D.C.E.D.Pa.) 50 F.R.D. 13, and let it be said emphatically that we join in all of the views expressed by him. Initially, it was held that the case should be dismissed for flagrant refusal to answer certain interrogatories, but the case then discusses *Hanover Shoe* as applied to facts which were presumed to be true because of plaintiffs' disregard of the interrogatories. The presumed facts were:

"1) That each of the present plaintiffs bought a house containing plumb-

ing fixtures rather than plumbing fixtures as such.

"2) That the present plaintiffs did not make their purchases pursuant to a preexisting cost-plus contract or analogous fixed markup type of arrangement."

Judge Lord then stated the substantive basis of the claims of plaintiffs as follows:

"1) When the wholesaler purchased the plumbing fixtures ultimately used in the construction of that plaintiff's house, the price paid included an unlawful overcharge.

"2) When the wholesaler sold those plumbing fixtures to the plumbing contractor, it passed on the overcharge to the latter.

"3) When the plumbing contractor sold those plumbing fixtures to the builder who constructed plaintiff's home, it passed on the overcharge to the builder.

"4) When the builder incorporated those plumbing fixtures in the home it constructed, it passed on the overcharge to the purchasing homeowner.

"5) Where the plaintiff homeowner bought his home from a prior homeowner, that such prior homeowner passed the overcharge on to the plaintiff.

"The doubtfulness of the economic connection between the initial overcharge, if any, and the price paid by remote purchasers, in the case of successive independent markets, together with the complex problems of proof of such 'passing-on' of the overcharge, have led the courts to develop certain limitations on the extent to which speculation on this connection can be permitted. Consideration of this development is therefore necessary here."

The opinion then reviews Chattanooga Foundry and Pipe Works v. City of Atlanta (1906) 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, and Southern Pacific

Co. v. Darnell-Taenzer Lumber Co. (1918) 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451. Judge Lord commented on the language of Justice Holmes in the latter case as follows:

> "It is especially significant that the Court in the above passage corollated its rejection of the passing-on defense as against plaintiff with a corresponding rejection of a right to recover by more remote purchasers. The Court emphasized as a basis for these views, 'the endlessness and futility of the effort to follow every transaction to its ultimate result.'"

Mention is made later in *Philadelphia Housing Authority* of the distinction drawn by Judge Goodrich in the early phases of *Hanover Shoe* [185 F.Supp. 826, aff'd. per curiam by the Third Circuit 281 F.2d 481]. Judge Goodrich held that the passing-on defense was not available to defendants, and he distinguished the oil jobber cases on the basis that the plaintiffs in those cases were middlemen rather than consumers.[1] Certainly after, if not before, the Supreme Court's decision in *Hanover Shoe*, we think that the true distinction is that the pricing structure in the oil jobber cases comes within the "cost-plus" exception noted in *Hanover Shoe*. This conclusion is supported by the pre-*Hanover Shoe* decision in Atlantic City Electric Co. v. General Electric Co. (1964) (D.C.S.D.N.Y.) 226 F.Supp. 59, where it was said:

> "In the oil jobber cases, the effect of the increased cost on the price of gasoline and the manner in which the increased cost was recouped were both easily identifiable."

After discussing the history of *Hanover Shoe* and after quoting from it at length, *Philadelphia Housing Authority* has this to say concerning the complex economic problems reviewed in *Hanover Shoe:*

> "All of the difficulties referred to by the Supreme Court with respect to tracing the impact of an overcharge are present in the instant case, and most to a much greater extent than in *Hanover*. Assuming that the price paid by the wholesaler to the manufacturer contained an unlawful overcharge, claims of the present plaintiffs rest, as has been indicated, at the very least on the following additional premises: (a) that the overcharge was then passed on by the wholesaler to the plumbing contractor; (b) that the plumbing contractor then passed the overcharge on to the builder; (c) that the builder passed on the overcharge to the purchasing homeowner; (d) in the case of used houses, each prior homeowner passed the overcharge on to the present plaintiffs. Each of these steps represents activity in a completely new and unrestrained market. The Court does not have before it a situation like that in the oil jobber cases, for even aside from any question of fixed markups, there is no assertion here that defendants through their alleged conspiracy, controlled any market beyond that in which they sold the fixtures to wholesalers."

The difficulty in tracing any overcharge for asphalt into a completed job will vary from job to job. On a repaving job, the cost of the asphalt would have to be broken out of the paving bid, and inquiry would have to be made as to how that cost influenced the bid. This would not be simple, but, as compared to tracing the cost of asphalt into the cost of a 10-mile stretch of a new highway blasted out of the Colorado mountains, the problem would be child's

---

1. Some of the "oil jobber cases" are: Clark Oil Co. v. Phillips Petroleum Co. (1945) (8 Cir.) 148 F.2d 580; Northwestern Oil Co. v. Socony-Vacuum Oil Co. (1943) (7 Cir.) 138 F.2d 967; Twin Ports Oil Co. v. Pure Oil Co. (1941) (8 Cir.) 119 F.2d 747; and Leonard v. Socony-Vacuum Oil Co. (1942) (D.C.Wis.) 42 F.Supp. 369.

play. Factually, the claims of the class members and their right to recover will vary from potential class member to potential class member dependent upon the type of contract entered into by them—not contracts entered into with defendants, but contracts entered into with countless contractors whose bidding formulae will all be different. To try this case as a class action might be an accountant's paradise, but it would be a court's purgatory. This case does not fall within the narrow exception carved out by the Supreme Court in *Hanover Shoe* where "cost-plus" contracts are involved. We, as did Judge John Lord in *Philadelphia Housing*, think that the "consumer-middleman" distinction is no longer valid, and we think that *Hanover Shoe* permits recovery when, but only when, there is privity or, in the alternative, when a case can be shown to be within the narrow limits of the exceptions mentioned by Justice White. Finally, we agree with *Philadelphia Housing's* statements that:

> "But the Court would be remiss if it overlooked entirely the fact that the Supreme Court did not have before it directly in *Hanover*, a situation in which purchasers at more than one level in the chain of distribution were plaintiffs as the Court does here. It could therefore be argued that the Court in the instant case does not have before it one policy consideration involved there: that of insuring that there was at least one party which could recover against the defendant and thereby preventing the defendant from retaining the fruits of its illegality and thwarting the purpose of the antitrust laws. On this basis it could be contended that the Supreme Court's decision in *Hanover* narrowly construed, does not require dismissal of the claims of the present plaintiffs.

> "However the Court cannot accept this argument for several reasons. First, the Court laid little stress on this consideration and discussed it very

briefly. . . . It is noteworthy in this connection that the Supreme Court in *Hanover* laid much less stress on this consideration than some of the courts in earlier cases. . . . In contrast, as has been seen previously, the Court laid extremely heavy stress on the doubtfulness of the economic connection between the overcharge and the level of the price charged by Hanover Shoe, Inc. to its customers as well as the difficulties of proof of such a connection. These considerations are present of course regardless of whether more remote purchasers are plaintiffs or not. The Court discussed these considerations in great depth and detail as can be seen from the portions quoted earlier. (392 U.S. 487–493, 88 S.Ct. 2224, 20 L.Ed.2d 1231). Second, these latter considerations are even more persuasive in the instant case than they were in *Hanover*. That is true because the use of the machinery in *Hanover* may well have been substantial in relation to the total cost of producing the shoes, whereas in the instant case the cost of the plumbing fixtures would comprise at most a very small portion of the total cost of building the houses in question. Third, the Court goes to great length to bring out the very sweeping nature of its rejection of the economic basis of a passing-on argument. . . . After describing various situations in which it is clear that a buyer's action does not preclude its recovery, the Court states that it now holds that a buyer is equally entitled to recover if he raises his own price. (392 U.S. 489, 88 S.Ct. 2224). The Court makes no attempt whatsoever to limit its statement of the rule to situations in which the party paying this increased price is not a litigant. Instead the Court sets forth an explicit rule that, except in the special circumstances described, proof that the buyer asserted to have passed on the loss did not recoup the excess cost by raising his own price is

simply not an element of that buyer's case. *And unless the court intended to state a rule permitting a double (treble) recovery of the same loss, which this court cannot believe, such a position must preclude recovery by more remote purchasers except in the same special circumstances.* (emphasis supplied).

*Philadelphia Housing* was affirmed as Mangano v. American Radiator & Standard Corp. (1971) (3 Cir.) 438 F.2d 1187. In a per curiam opinion, the Third Circuit held:

"We have considered and affirm the district court's decision as based upon substantive law involved in the homeowners', commercial building owners', and apartment building owners' cases. More particularly, absent a showing by the plaintiffs that their purchases were made 'pursuant to a preexisting cost-plus contract or analogous fixed markup type of arrangement,' Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 50 F.R.D. at 19, it is appropriate, in light of Hanover Shoe, Inc. v. United Shoe Machinery Corp., 1968, 382 U.S. 481, [88 S.Ct. 2224,] to dismiss those three cases. Manufacturers' overcharges on the order of ten to twenty dollars for plumbing fixtures used in buildings selling at twenty to thirty thousand dollars are indicated. The interrogatories gave the plaintiffs an opportunity, of which they could or would not take advantage, to show that these overcharges became components of the prices they paid. In these circumstances, the district court was justified in concluding that these plaintiffs were faced with the 'insuperable difficulty' spoken of by the Supreme Court in the *Hanover* case, of demonstrating that any manufacturer's overcharge was a *causa sine qua non* of any payment any of them had to make. In addition, we agree with the district court's conclusion that the plaintiffs involved here were not the first consumers in a chain of distribution."

With equal clarity, many of the entities sought to be included in the class here are not the first persons in the chain of distribution, and *Mangano* may well prevent recovery on their part. Certainly, with this very real possibility in the offing, it would be foolhardy to make this case into a class action before we find out just how predominate the common issues of fact and law are.

■ Therefore, in accordance with the mandate of Rule 23, the Court determines:

1. The proposed class is not so numerous that joinder of all members is impracticable.

2. There are some questions of law or fact common to the class.

3. The claims of the representative parties are typical of the claims of some of the class, but they are not typical of all members of the proposed class.

4. The questions of law or fact common to the members of the class do not predominate over questions affecting only individual members.

5. As will be discussed in a moment, a class action is not superior to other available methods for the fair and efficient adjudication of the controversy.

6. The action shall not be maintained as a class action.

■ Having determined that this shall not be a class action is not to say that attention should not be paid to attempting to effect economies of litigants' and the court's time. This we think can be done by giving notice to all proposed members of the class (plus the Colorado Municipal League, the Colorado Association of County Commissioners and the Attorney General of the State of Colorado) that the case is pending and that a rather loose intervention procedure will be followed. Accordingly, a form of notice has been prepared, and a copy of it is attached to this opinion

as Appendix A. In essence, notice is given of the court's decision that the case is not to be maintained as a class action, and the recipients of the notice are told that they may apply to intervene within 45 days. Applications to intervene by direct purchasers will be granted as a matter of course unless defendants object within 15 days of the date of the application. Applications to intervene by indirect purchasers will be set for hearing without necessity for objection by defendants. As is spelled out in the notice itself, preliminary discovery rules are set out for both direct and indirect purchasers who want to intervene. It is believed that this procedure (as it may have to be modified as the case progresses) will bring about a fairer and a faster final result for all interested parties. The avalanche of class actions now submerging the federal courts demands experimentation with somewhat innovative procedures; and, above all, that avalanche requires that courts look into the future to anticipate as nearly as may be problems which will arise following a determination to enter upon a class action. If it is evident at the outset that *Hanover Shoe* problems will apply to some but not all members of a proposed class, or if those problems will apply to the proposed members in substantially differing ways, a class action will accomplish a waste, not an economy, of judicial and litigants' time, and the final results are much less likely to be fair. The foregoing explains why we think this should not be a class action.

A few housekeeping chores remain before this opinion is concluded. In our determinations under Rule 23, we consciously omitted mention of the determination required by Rule 23(a) (4) that "the representative parties will fairly and adequately protect the interests of the class." Defendants do not challenge the competence of special counsel employed by the City and County of Denver, and counsels' experience and their presentation of this case to the

court leave no room to doubt their ability. But, defendants have raised the right of the City and County of Denver to represent the many governmental agencies in whose behalf the city seeks to appear. The challenge goes not to any matter of general law, for as we have seen, the City of Philadelphia is a nominal party in one of the *American Oil Cases* before Chief Judge Augelli. The question presented is one arising under the language of Article XX of the Colorado Constitution—the so-called home rule amendment. If we had found present all other prerequisites to a class action determination, we would have been confronted with this meaty problem. In light of that which we have already held, we need not resolve this question, and most certainly we should abstain and should leave the matter for decision by the Colorado state courts where we are not required to make a decision. We say only that we do not decide the question, but we recognize that defendants' arguments on this point are far from frivolous. If we were to determine that under Article XX of the Constitution of Colorado, the City and County of Denver can bring a class action such as this, another problem would remain still for determination.

That problem, and our comments concerning it are these: For decades, Denver has engaged in internecine warfare with its surrounding communities and with western slope interests over problems of annexation and water rights. The benevolence of the city in seeking to protect the financial interests of all other governmental entities in the state will undoubtedly come as a surprise to many of those governmental units. We all know that, as is true with most large cities today, Denver's city government is poverty stricken, and it is curious that to protect the public weal of the entire state and its many communities, Denver is willing to pick up the tab of litigating in behalf of 126 other governmental agencies, because, if a class action be al-

lowed, any costs of lengthy discovery which are advanced will have to be advanced by Denver. The record is silent as to the authorization given for this class action by City Council, but, should plaintiffs lose the case, one cannot help but wonder whether the quite substantial financial load of discovery applicable to 126 class members is to be paid by Council or counsel. We must assume that it is to be paid by Council, Colo. R.C.P., Appendix B, 28, 42, but if it were necessary to reach the question, we think that the record should show an appropriate authorization by the City and County of Denver to incur these expenditures for the benefit of others. Such inquiry seems to us to be essential before a class action is created in light of Judge Weinstein's scholarly opinion in Dolgow v. Anderson (1968) (D.C. E.D.N.Y.) 43 F.R.D. 472, where he discusses the history of class actions and of new Rule 23. He comments on the therapeutic value of class actions and on the fact that the new rule was designed in part to eliminate the criticism that under the former rule class actions were said to stir up plaintiffs and to provide fees for lawyers. We too think that the elimination of this criticism was one of the reasons for the new rule, and, if it was, we think it would be appropriate to inquire, preliminarily to a class action determination, whether Council or counsel are paying for the lawsuit. But, in light of that which we have held earlier in this case, that inquiry need not be made here.

It is determined that this case shall not be maintained as a class action.

### APPENDIX A

"NOTICE TO THE STATE OF COLORADO, ALL COUNTIES WITHIN THE STATE AND ALL CITIES AND TOWNS WITHIN THE STATE WITH POPULATIONS OF 2,500 OR MORE, WHICH PURCHASE, DIRECTLY OR INDIRECTLY, ASPHALT, THE ATTORNEY GENERAL OF COLORADO, THE COLORADO MUNICIPAL LEAGUE, AND THE COLORADO ASSOCIATION OF COUNTY COMMISSIONERS

"1. You and each of you are hereby notified that Plaintiff, City and County of Denver, has filed a Complaint alleging that Defendants engaged in a combination and conspiracy in restraint of trade and commerce in asphalt as hereafter defined in violation of the Sherman Anti-Trust Act. Plaintiff's Complaint was filed as a class action on its own behalf and as the representative of the class of all governmental purchasers of asphalt in the State of Colorado. The Complaint further alleged that the combination and conspiracy consisted of an agreement among the Defendants to raise, fix, stabilize and maintain prices in the City and County of Denver and in the State of Colorado. Each of the Defendants filed an answer denying the material allegations of the Complaint, and expressly asserting various legal defenses.

"2. Plaintiff in Paragraph 12. of its Complaint defines 'asphalt' as follows:

"[T]he term 'asphalt' means an asphaltic by-product produced in refining crude oil and includes various types and grades of asphalt which fall into the generic classification of liquid asphalts, paving asphalts, asphaltic emulsions or bitumuls, or road oils. The term 'asphalt' further includes related materials added to asphalt to change the viscosity and binding characteristics.

"3. By letter dated May 3, 1971, addressed to this Court, Plaintiff defined the members of the alleged class as follows:

"The State of Colorado, its Departments, Agencies, Commissions and Institutions, all counties within the State, and all cities and towns within the State, incorporated or unincorporated, with populations of 2,500 or

more (according to the 1970 Federal census), which purchased, directly or indirectly, asphalt (as defined in Paragraph 12. of the Complaint) during the period of suit.

"4. After full brief and argument, the Court determined that this action cannot be maintained as a class action because (a) with respect to direct purchasers the class is not so numerous that joinder of all members is impracticable as required under Rule 23(a) (1) of the Federal Rules of Civil Procedure, and (b) that with respect to indirect purchasers the questions of law or fact common to the members of the class do not predominate over questions affecting only individual members as required by Rule 23(b) (3). The latter conclusion of the Court resulted from its application of the doctrine expressed by the Supreme Court of the United States in Hanover Shoe, Inc. v. United Shoe Machinery Corporation, 392 U.S. 481 [88 S.Ct. 2224, 20 L.Ed.2d 1231] (1968), namely, that each indirect purchaser would be required to prove that the alleged overcharge had been passed on to him, and that (under *Hanover Shoe*) this could be done only in situations where the fact of passing on and the amount thereof could readily and accurately be established and where he comes squarely within one of the exceptions in *Hanover Shoe*—for instance, when a governmental buyer has a pre-existing 'cost plus' contract for a completed highway which would enable him to trace or segregate the alleged price increase in asphalt down through the intermediate merchandising and construction chain into the total cost of the highway. Thus, the question of liability as to indirect purchasers, under the passing on doctrine, will differ from member to member. A full transcript of the Court's oral ruling is available for your inspection at the office of the Clerk, United States Courthouse, Denver, Colorado.

"5. Any recipient of this Notice who may wish to file an application to intervene in this action may do so. Such application must be filed within 45 days of the date of this Notice and in strict accordance with Rule 24(c) of the Federal Rules of Civil Procedure.

"6. Each application for intervention by a direct purchaser shall be granted without a hearing unless one or more of the Defendants objects to said application within 15 days from the receipt thereof. If an objection is filed, the Court will set the application down for hearing. The motion to intervene as a direct purchaser shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim for which intervention is sought and shall allege with particularity the name or names of the Defendants from whom purchases of asphalt were made, the time period during which such purchases were made, the approximate volume of asphalt so purchased, and the name of the purchasing entity if it is different from the name of the intervenor. An applicant for intervention as a direct purchaser shall be subject to all discovery procedures provided for in the Federal Rules of Civil Procedure.

"7. Each application for intervention by an indirect purchaser shall be set down for hearing without the necessity for an objection or a request for such a hearing by any Defendant. The motion of the indirect purchaser to intervene shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim for which intervention is sought and shall set forth with particularity the name or names of the persons from whom it purchased asphalt, as defined in the Complaint. However, if the applicant certifies that to compile such a list would be unduly burdensome, then in lieu thereof said applicant may offer to make records containing such information available for Defendants' inspection. The pleading shall also set forth the time period during which such purchases were made and the approximate volume of such pur-

chases. The hearing on applications to intervene by indirect purchasers shall be delayed until after all discovery relating to the issues raised by the *Hanover Shoe* doctrine has been completed. Any application to intervene by an indirect purchaser shall automatically subject the applicant to preliminary discovery by Defendants relating to issues raised by the *Hanover Shoe* doctrine; and any applicant who is permitted to intervene as an indirect purchaser shall thereafter be subject to the usual and applicable discovery rules as set forth in the Federal Rules of Civil Procedure.

"8. All filings made pursuant to this Notice shall be filed with the Clerk of the United States District Court for the District of Colorado, Denver, Colorado, and copies thereof shall be served on each Defendant."