**AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY et al., Plaintiffs-Appellants,**

v.

**AMERICAN BROADCASTING–PARAMOUNT THEATRES, INC., Defendant-Appellee.**

**Nos. 921, 922, Dockets 35133, 35546.**

United States Court of Appeals, Second Circuit.

Argued June 16, 1971.

Decided Aug. 10, 1971.

See also D.C., 45 F.R.D. 38.

John W. Castles, 3d, New York City (Gordon B. Spivack, Charles P. Raynor, New York City, of counsel, Lord, Day & Lord, New York City, on the brief), for plaintiffs-appellants.

Clarence Fried, New York City (Charles L. Kades, New York City, of counsel, Hawkins, Delafield & Wood, New York City, on the brief), for defendant-appellee.

Before MOORE, KAUFMAN and TIMBERS,* Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The single issue raised on this appeal from Judge Tenney's dismissal of this antitrust action brought by a group of insurers, commonly known as The Kemper Insurance Companies, was framed by an earlier decision of this Court, reported at 388 F.2d 272 (1967), reversing the district court's previous award of summary judgment to defendant-appellee, American Broadcasting-Paramount Theatres, Inc. (ABC), 270 F.Supp. 619 (1967), and remanding for a trial on the merits.

Although the previous reported opinions in this case together with the decision appealed from now consume nearly 200 pages in the record and together thoroughly recount every factual detail relevant to the issue presented to us, a further distilled account of those facts we consider decisive to set forth the issue and resolve it will be necessary.

On January 9, 1963, ABC instituted a proceeding in the Supreme Court of New York to recover damages based on Kemper's refusal to adhere to a contract which bound Kemper by its terms to sponsor one night each week for twenty-four weeks ABC's quarter hour early evening news program, the "Evening Report." Subsequently the state court struck from Kemper's answer to ABC's complaint Kemper's defense that the contract constituted an illegal tying arrangement under Section 1 of the Sherman Act, 15 U.S.C. § 1. That allegation then became the basis for this present litigation. Kemper seeks to recover as its principal item of damages, to be trebled pursuant to 15 U.S.C. § 15, ABC's ultimate recovery in the state litigation of $328,865.03. Kemper has satisfied

---

* Chief Judge of the District of Connecticut, sitting by designation, when oral argument was heard.

this judgment under protest that it represents enforcement of an unlawful agreement.

Plaintiff's antitrust theory is not complex, but due to the nature of the question that the district court found determinative, its resolution required a careful scrutiny of the convoluted negotiations that led to the final entry by the parties into the formal contract whose legality Kemper has put in question. Kemper's contention is that during a segment of those negotiations in the Spring and Summer of 1962, and sometime prior to the signing of the formal contract which is dated August 15, 1962, ABC exerted unlawful economic pressure and coerced Kemper to sponsor the Evening Report over several local television broadcasting stations affiliated with the ABC network. The details of the arrangements between ABC and the local stations are set forth in the earlier opinions in this case and shall not be repeated. In sum, it is Kemper's claim that it did not wish to sponsor the broadcasts over these local stations but was forced to do so as a condition to being permitted to sponsor broadcasts over other local affiliates of ABC whose sponsorship was desirable to Kemper.

Judge Tenney originally dismissed the complaint and granted summary judgment for ABC on several grounds, including the only one at issue on this appeal, *viz.*, whether, as Judge Tenney concluded in each of his decisions, Kemper could not have been coerced as it claims because it did not seriously bargain for the elimination of the alleged unwanted sponsorships. Judge Tenney was of the view that Kemper had abandoned its initial attempt to exclude the "unwanted" stations from the agreement and that its judgment was not affected by any manner of "coercion" on the part of ABC, but was attributable entirely to Kemper's bargaining strategy. On the appeal from Judge Tenney's grant of

summary judgment, we found a "genuine issue of fact" presented with respect to each of the rationales for the dismissal at that early stage of the litigation, and thus were required to remand for a full trial. On remand, Judge Tenney adopted the suggestion made, in our opinion which reversed the dismissal, that judicial economy would be served were he to try separately at the outset the question whether "Kemper's refusal to negotiate" further and more vigorously than it did the question of eliminating unwanted stations "was unreasonable," or whether to the contrary Kemper "reasonably" decided that any attempt to bargain further would have been futile.

Following a three-day trial on this question, Judge Tenney filed a thorough and careful opinion. He found that Kemper "acted unreasonably in failing to negotiate further with ABC in this regard after May 18, 1962," admittedly the last date that Kemper broached the idea of eliminating undesirable stations to ABC. With one exception which we deem immaterial,[1] Kemper does not now contend that any of Judge Tenney's subsidiary factual findings are "clearly erroneous," F.R.Civ.P. 52(a). Rather, its position is that Judge Tenney applied erroneous principles of law and that in any event his ultimate conclusion is unsupported by the underlying facts and findings.

We disagree and affirm the judgment below.

## I.

### A. *Preliminary Negotiations*

The negotiations that resulted in the August 15, 1962 contract unfolded in three stages. A period of primarily verbal and informal written communications began January 25, 1962, with a preliminary oral offer by a representative of ABC and ended May 4 when Kemper sent ABC a more detailed and

---

1. Kemper alleges that Judge Tenney misconstrued the precise events at an important meeting on May 18, 1962, which we briefly describe below. Assuming Kemper's version of the facts were correct, we are of the view that it would not affect Judge Tenney's reasoning or conclusion, nor does it affect ours.

formal "order letter." It is interesting that prior to the May 4 letter, the negotiations had not focused on the question whether Kemper would sponsor each of ninety-nine local affiliates of ABC which at that time had "cleared," i. e. agreed to carry, the "Evening Report." The incidental character of the question whether the ninety-nine stations "then going lineup" might be more extensive than optimally desirable to Kemper is indicated by the nature of a formal recommendation, known as the "Silver Report," prepared by Buckingham W. Gunn, senior vice-president and director of broadcasting services of Kemper's advertising agency, Clinton E. Frank, Inc. (the Frank Agency). Gunn prepared the Silver Report prior to an important meeting between ABC, Kemper and Frank representatives which was held on April 17, 1962. Appended to the report were three lists of broadcasting stations, one consisting of the ninety-nine station cleared lineup, one of fifteen other stations whose clearance was then described as "pending," and the third of thirteen additional stations listed as "non-clear." The twenty-eight stations on the two supplemental lists were located in areas that Kemper had earlier identified internally as desirable advertising markets. Throughout the negotiations, Kemper bargained intensively to protect its interest in these twenty-eight stations and indeed succeeded in substantial part in doing so in the final contract.

The body of the Silver Report included an expression of hope that all of the twenty-eight desirable stations would be cleared, but indicated doubt that the thirteen "non-cleared" stations would carry the news program. There was no mention in the body of the report of any unwanted stations, and thus, of course, no suggestion either that the existence of some superfluous outlets would render the sponsorship agreement materially less desirable to Kemper. Although twenty of the ninety-nine stations on the appended list of cleared stations were marked with asterisks as "markets Kemper does not want," those twenty outlets had apparently been identified by telephone to Gunn's secretary only a day or so before April 17 by Mr. DeMark, Kemper's advertising manager, after reviewing the cleared list and speaking "off the top of * * * [his] head." Thus, the Frank Agency seems to have formulated its initial recommendation considering it not an important factor, and indeed with only casually recognizing the issue that there were included some unwanted stations on ABC's then-going lineup.

Later events are entirely consistent with the conclusion that Kemper never viewed the exclusion of unwanted stations as material to the negotiations. Participants at the April 17 meeting were unclear in their testimony and in written submissions to Judge Tenney about the extent that undesirable stations were discussed at that time, although their presence in the ABC lineup was at least pointed out by ABC and Frank Agency officials. But it is agreed that the discussion at that meeting centered primarily on other issues that clearly were of major interest to Kemper, especially the problem of the twenty-eight desired but not yet cleared stations and also some difficulty with the broadcast time of the Evening Report in Chicago.

These two issues were similarly De-Mark's prime concern as reflected in a letter addressed by him to Mr. Kemper dated April 18 reporting the results of the meeting the day before. This letter made no mention of any unwanted stations, but did recommend that Mr. Kemper intercede to persuade ABC to adjust the Chicago broadcast time and to arrange acceptable terms with respect to the twenty-eight desired but uncleared stations.

B. *Negotiations Following Kemper's May 4 Order Letter*

After April 27, Frank Agency officials, working with a more authoritative and definitive list of unwanted advertising markets, based on a study of Kemper's volume of business and of the au-

diences of the stations in question, identified thirty-two of the ninety-nine station ABC going lineup which it contends in this litigation were superfluous to its advertising program. These stations were deleted from those requested for sponsorship in Kemper's May 4 order letter, which initiated a second more formal stage of the bargaining by proposing that Kemper sponsor the Evening Report on ninety-five specified stations, sixty-seven from ABC's then-going lineup and the additional twenty-eight which had been the subject of the earlier discussions. It is significant that the price per quarter-hour segment offered by Kemper in its May 4 letter based on its own optimal lineup of ninety-five stations did not differ significantly from the price offered by ABC and apparently agreed upon in principle by Kemper at the April 27 meeting.[2] Thus, Kemper's May 4 offer did not suggest that it anticipated any monetary advantage to accrue were the unwanted local broadcasts "blacked out" from Kemper's sponsorship.

Whether or not, as seems likely and as the district court suggested, the May 4 offer represented only a ploy intended to strengthen Kemper's bargaining hand and calculated to enhance its chance to secure those terms that were truly important to it, the casual and incidental formulation of the schedule of unwanted stations prior to May 4 substantially supports the district court's conclusion, especially in light of later events, that Kemper subsequently abandoned this issue after ABC offered an initial negative response, without any coercion by ABC. ABC's initial response was indeed, as might well have been expected, decidedly adverse, but there is no evidence that this reaction ever crystallized into any identifiable or reasonably definitive policy within ABC. There was evidence, in fact, that even Gunn himself was somewhat surprised by the May 4

letter (which appears to have been largely DeMark's product), when he was told of the terms by Mr. Beebe, an ABC official, who at that time commented vaguely to DeMark that to black out stations "would cost" and that ABC "would have to renegotiate" the contract.

The events following this first Beebe-DeMark communication are undisputed and may be briefly stated. In response to the May 4 letter, Mr. Hede, a vice president and administrative sales manager for ABC in New York, informed Mr. Arne Nordmark, sales service manager for ABC in Chicago, that Kemper's truncated list of sixty-eight then-going stations could only be purchased at "rate card." "Rate card" indicated a charge based primarily on ABC's schedule of payments to its local affiliates for their broadcasts of network programs sponsored by national advertisers. These rates would have represented approximately a ninety per cent increase over the price previously negotiated by ABC and Kemper and which was the basis for Kemper's May 4 letter.

On May 10, 1971, ABC formally replied to Kemper with a counteroffer adopting many of the terms of the May 4 letter, including the total per segment price, but substituting the full ninety-nine station lineup for Kemper's sixty-seven. As Judge Tenney found, since ABC's offer requested virtually the same price that Kemper itself had been willing to pay for twenty-eight fewer stations, almost any blackout charge for eliminating the unwanted stations would probably have been too expensive for Kemper.

Moreover, at a key meeting on May 18 among officials of all three of the concerned companies, ABC told Kemper that the cost of blackouts would be "exorbitant." Kemper does not claim that this characterization represented a firm ABC position, but merely that ABC agreed to consult further with officials in its

---

2. The details of the terms of the May 4 offer, those discussed at the April 27 meeting, and those evolved through later negotiations, as well as relevant but not central events unnecessary to setting forth the grounds for our affirmance, may be found in the earlier opinions in this case.

New York office as to the feasibility and price of selective blackouts. Prior to receiving any more definite word on this issue, however, DeMark on May 21 mailed Mr. Kemper a recapitulation on the progress of the talks, which again ignored the issue of the unwanted stations. DeMark now expressed primary concern about possible undesirable co-sponsors with Kemper. At a meeting on May 27 Kemper and DeMark resolved this new problem to their own satisfaction and in a memorandum dated May 28 Mr. Kemper agreed that Kemper should proceed to negotiate a final contract. There is no evidence that the question of eliminating stations was a condition of, or even was an issue that bore upon this understanding. It was only subsequent to this decision to negotiate a final contract without regard to the elimination of unwanted stations, that Nordmark told DeMark that Kemper could have the abbreviated Kemper lineup at "rate card." Thus, as Judge Tenney found, "it now appears clear that Mr. DeMark did not hear that ABC would not give Kemper its own lineup of 95 stations unless they 'went rate card,' until after Kemper had made the decision to order the then-going lineup."

#### C. *Negotiations After Kemper Abandoned Its Lineup*

Subsequent to May 18, as we have said, Kemper did not again suggest that ABC eliminate any stations from its then-going lineup. Specifically, it never attempted to secure from ABC a statement of the *cost* to ABC of blacking out the unwanted stations. This failure to press the issue of cost is particularly conspicuous in the light of Kemper's intensive bargaining to secure an option, which it did in fact secure, to pick and choose which stations to sponsor among those that might clear the Evening Report after the contract was concluded. The final contract vested in Kemper "the right to accept or reject any additional station to the [then-going] lineup * * *." To this must be added Judge Tenney's finding in his first opin-

ion in this case, that "it was ABC's practice to negotiate with advertisers a final price at a *further discount* from the offering sheet prices [the price based on 'rate card' plus certain volume discounts], and that television network prices are negotiated prices." 270 F. Supp. at 624. In view of the fact that ABC had already offered Kemper a very substantial discount over rate card to induce it to sponsor Evening Report, Kemper could reasonably anticipate that ABC would yield substantial ground from its initial "rate card" position had Kemper pressed the point. But as is apparent from all the above, Judge Tenney was entirely justified in finding that ABC did not coerce Kemper to break off talks about its ideal lineup because "after the 'feeler' of May 4, the 'unwanted' stations were never a matter of concern to Kemper * * *."

### II.

Kemper argues that, even accepting the facts as stated above as accurate, ABC must nonetheless be found to have coerced it into accepting an unlawful tying arrangement on the principle, as formulated by Kemper, that "whenever [a seller] offers a buyer a package; the buyer states he only wants certain items in the package, and the seller delays *at all* in offering to sell the designated items at prices which are equivalent to the package price," taking into account any costs saved by selling the entire package, then the seller violates Section 1 of the Sherman Act (emphasis added).

We find this sweeping proposition untenable, for reasons that may be illustrated by Kemper's misplaced reliance on the *remedy* granted to the plaintiff in United States v. Loew's, 371 U.S. 38, 53–55, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). That the Court there included in its order a proscription against any delay in "producing individual prices" for motion picture films is not relevant here as demonstrated by the Court's careful dissociation of the remedial measures there adopted, after a violation had been

made out, from activities prohibited by the Sherman Act in the first instance:

> "Some of the practices which .the Government seeks to have enjoined with its requested modifications [which the Court granted] are acts which may be entirely proper when viewed alone. To ensure, however, that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined." *Id.* at 53, 83 S.Ct. at 106.

In *Loew's* the "acts found to be illegal" were those of motion picture distributors who conditioned the license and sale of feature films on the acceptance of unwanted or inferior files. The "gravamen" of the complaint was the "*successful pressure* applied to television station customers to accept inferior films * * *." *Id.* at 40, 83 S.Ct. at 99 (emphasis added). Here, ABC exerted no pressure on Kemper, successful or not. We agree that it is not decisive, as Kemper correctly asserts, that Kemper found the August 15 contract economically advantageous given the available alternatives, since that is a necessary characteristic of most contracts, including illegal ones. But there can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice.

Tying arrangements are abhorred by the courts primarily because they foreclose a substantial quantity of business to competitors and extend preexisting economic power to new markets for no good justification. See Fortner Enterprises, Inc. v: United States Steel Corp., 394 U.S. 495, 500–501, 89 S.Ct. 1252, 22 L.Ed. 495 (1969). Foreclosure implies actual exertion of economic muscle, not a mere statement of bargaining terms which, if they should be enforced by market power, would then incorporate an illegal tie. To adopt Kemper's position would subject businesses to threats of antitrust sanctions whenever they tried by bravado to buttress a sagging market position by initially offering small quantities of desired goods at high prices, in hopes of eliciting a large order without further negotiation. Such bartering ploys are not generally the concern of antitrust laws.

In this case, ABC's initial amorphous negative response to Kemper's May 4 letter undoubtedly exercised at least a marginal influence on Kemper's decision to pursue that tack no further. But Kemper was uninterested in paying *any* significant additional fee for blacking out unwanted stations and for this reason among others it never sought or received a reasonably firm ABC offer for the Kemper lineup. We commented in remanding this case for trial that the antitrust laws do not require "joust[ing] with windmills." 388 F.2d at 285. It is not apparent, to turn the metaphor, that Kemper never discovered whether it faced a windmill or a bona fide giant. ABC's preliminary bargaining position may have influenced Kemper, but Kemper did not persevere long enough with its ideal lineup to feel any economic pressure from ABC, and we cannot know whether ABC would ever have tried to bring any such pressure to bear.

The judgment is affirmed.