Jack D. ABERCROMBIE and Margaret
A. Abercrombie, et al., Plaintiffs,

v.

LUM'S INC. et al., Defendants.

No. 71–602–Civ.

United States District Court,
S. D. Florida,
Miami Division.

June 14, 1972.

Daniel A. Kavanaugh, Miami, Fla., Phillip D. Bostwick, Shaw, Pittman, Potts, Trowbridge & Madden, Washington, D. C., for plaintiffs.

Smith, Mandler, Smith & Parker, Miami Beach, Fla., Royal, Koegel & Wells, New York City, for defendants.

## OPINION, FINDINGS AND ORDER

KING, District Judge.

This antitrust suit was brought as a class action by Jack and Margaret Abercrombie and their franchisee corporations against their franchisor, Lum's Inc., and its subsidiaries. Plaintiff seeks to represent approximately 400 past and present Lum's franchisees in a class action.

Plaintiffs claim defendants violated §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act (15 U.S.C. §§ 1, 2, and 14) by imposing tying arrangements through their franchise agreements (Complt. ¶¶ 14–16).

The question of whether to maintain this suit as a class action has been raised by cross motions.

The instant antitrust claim was transferred to this Court on April 18, 1971, upon defendants' motion under 28 U.S.C. § 1404(a) from the Eastern District of Virginia, where it had been filed on July 17, 1970 as one claim of a five-count complaint.[1] The Virginia Court made an initial determination that this case could proceed as a class action. The Court inferred that there was "some sort of standard franchise agreement between Lum's and its franchisees", and, relying on Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967), modified sub nom., Chicken Delight, Inc. v. Harris,

412 F.2d 830 (9th Cir. 1969), concluded that class treatment was proper.

In its order determining this cause to be a proper class action, the Virginia Court stated: "That there is some sort of standard franchise agreement between Lum's and its franchisees, at least in terms of the alleged Sherman Antitrust violations, seems a fair inference from the pleadings and oral arguments presented". The transferor Court did not, however make specific findings relative to Rule 23(b).

Plaintiffs renewed their motion to send out class notices after the case was transferred to this District. By order dated September 27, 1971, the motion was denied, with leave to renew upon termination of discovery relating to the class action issue. A hearing was held on October 27, 1971 on the class action issue, and decision was reserved. A second hearing was held on November 11, 1971 in order to consider possible communication with the class members.

A final extended hearing on the class question was held on March 9, 1972 at which time all aspects of the class motion were reviewed. Counsel subsequently submitted additional briefs on the class action question. Since the transfer of this case the parties have conducted extensive discovery. Tortuous examination of what is now an adequate record for such a determination convinces the Court that this case should not proceed as a class action.[2]

The essence of plaintiffs' claim is that, through their franchise agreements with defendants, they were unlawfully required (Complt. ¶ 14): (a) to purchase signs and equipment from defendants and to purchase furniture, fixtures, supplies,

---

1. The Virginia Court dismissed the remaining counts.

2. The District Court in Virginia did not have the benefit of the discovery and the extended briefs, affidavits and submissions by both sides which have been of aid to this Court in determining this motion. Rule 23(c) (1) provides that an order under Rule 23 may be "altered or amended" before a decision on the merits.

See also: State of Illinois v. Harper and Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969) reversing School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa. 1967); In re Plumbing Fixture Cases, 298 F.Supp. 483, 493 (J.P.M.L.1968); Lewner v. Occidental Petroleum Corp., CCH Fed.Sec.L.Rep., 1970–71 Transfer Binder ¶ 93,100 (S.D.N.Y.1971).

foods, and beverages from defendants or their approved suppliers, (b) to lease their restaurant sites to defendants who would then sublease the sites back to plaintiffs at the same rental paid by defendants plus 5% of their gross sales and, in some cases, other charges, (c) in some cases to secure their sites from persons designated by Lum's and to deal with building contractors designated by Lum's, and (d) to permit Lum's, upon termination of the franchise agreement, to repurchase equipment and fixtures from them. The defendants have denied these allegations.

Some understanding of the Lum's franchise system is necessary in order to place the contentions of the parties on this motion in proper perspective. In addition to operating company-owned restaurants, Lum's franchises third parties to operate restaurants under the "Lum's" trademark and to sell products under the trademarks and trade names "Lumdog" and "Lumberger". Although the Lum's franchise agreements followed the same general format, the substance was changed materially on a number of occasions. Defendants have submitted approximately 12 different types of agreements which were executed from time to time. Both plaintiffs and defendants have submitted analyses of the agreements which reveal that there are at least three groups of agreements differing materially in substance from one another.

With the exception discussed below, these agreements do not require purchases by the franchisee from any particular source. A common provision in virtually all plaintiffs' agreements, for example, states:

"FRANCHISEE further covenants to purchase fixtures, equipment, foods and supplies from such suppliers as are designated or approved by LUM'S from time to time."

Paragraph (d) of the franchise agreement for Abercrombie's Titusville store provided:

"FRANCHISEE further covenants to purchase equipment, furniture, fix-

tures, foods, beverages and supplies from such suppliers as are designated or approved by Lum's from time to time, at prices that shall be competitive with national suppliers, in the area for the franchise, for equal quality merchandise."

The franchise agreements also provide that the franchisees are responsible for locating their own sites for their restaurants, with Lum's having a right of approval, and that the franchisees are to lease the sites so selected to Lum's or its subsidiaries. The sites are then, under the provisions of the franchise agreements, leased back to the franchisees at the same rental plus 5% of the gross sales from the respective restaurants. Defendants contend that the 5% charge is in effect, a royalty payment. There are no other provisions for royalty payments in the franchise relation.

The franchise agreements further provide that the franchisor will assist the franchisee, who may be inexperienced, in various ways. Normally, it appears, an opening crew from the franchisor assists in readying each store to open. Among other duties, that crew stocks the stores for the opening, but there is no express agreement that the same brands be stocked thereafter.

No extended discussion is necessary to confirm the desirability of class actions in a proper case. The advantages to such actions are apparent in the resolution of claims "based on a wrong common to all." Green v. Wolf Corporation, 406 F.2d 291, 300 (2d Cir. 1968). The rule serves the interests of both the parties and the courts by eliminating the need for repetitious and possibly inconsistent litigation. E. g., Schaffner v. Chemical Bank, [339 F.Supp. 329] (S.D.N.Y.1972); Philadelphia v. American Oil Co., 53 F.R.D. 45, 51 (D.N.J.1971). Rule 23 also serves a particularly salutary purpose in affording an opportunity for the redressing of rights in cases where the claim "would otherwise be too small to warrant individual litigation." Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 560 (2d Cir. 1968); In re Antibiotic Anti-

trust Actions, 333 F.Supp. 278, 282 (S.D.N.Y.1971); Dolgow v. Anderson, 43 F.R.D. 472 (D.C.N.Y.1968).

Each proposed class action must be carefully examined in light of the requirements set forth in Rule 23. Here that examination turns principally upon the requirements of Rule 23 that there be "questions of law or fact common to the class" [23(a) (2)] which "predominate over any questions affecting only individual members" [23(b) (3)] and that the plaintiffs be members of the class they purport to represent [23(a)].

■ While the particular merits of plaintiffs' claims are not an issue to be considered upon a class motion under Rule 23 [Miller v. Mackey International, Inc., 452 F.2d 424, 427 (5th Cir. 1971)], an analysis of the issues and the nature of proof which will be required at trial is directly relevant to a determination of whether the matters in dispute are principally individual in nature or are susceptible of proof equally applicable to all class members. *E. g.*, Denver v. American Oil Co., 53 F.R.D. 620 (D.Colo. 1971).

The essence of plaintiffs' claim is that allegedly illegal tying arrangements were imposed upon them (Complt. ¶¶ 14–16). The Supreme Court has defined such an arrangement as:

> "[A]n agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."

Northern Pacific R. Co. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).[3]

Basic to this entire case, therefore, will be proof as to whether or not tying agreements between seller and buyer actually exist. Evidence of such arrangements could be shown (a) by proof of contractual obligations imposed in the franchise agreements, or (b) by proof that the franchisee was required through his dealings with the seller, extrinsic to any express agreement, to purchase an unwanted product.

There were a number of Lum's franchise agreements in effect from time to time, materially varying in several important respects.[4] This, of itself, leads to a proliferation of issues. See Gaines v. Budget Rent-A-Car Corp., CCH Trade Reg.Rptr., ¶ 73,860 (N.D.Ill. Feb. 11, 1972). The tie-ins alleged here may not be proven through the franchise agreements alone since plaintiffs' agreements impose only one express purchasing requirement.[5] Rather, as noted previously, the right to select their own vendors was contractually unimpeded, subject only to Lum's approval.[6]

This case is therefore in marked contrast to Siegel v. Chicken Delight, Inc., *supra*, and its progeny upon which plaintiffs rely as their principal authority. *E. g.*, In re International House of Pancakes Franchise Litigation, 331 F.Supp. 556 (J.P.M.L.1971); and Butkus v. Chicken Unlimited Enterprises, Inc., CCH Trade Reg.Rptr. ¶ 73,780 (N.D.Ill. 1971). Those cases involved express con-

---

3. Accord, Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 497, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

4. For example, some agreements merely specify that Lum's shall "approve" the franchisees' equipment; others also specify the price which the franchisee agrees to pay it if he decides to purchase the equipment from Lum's, while others state that Lum's will make the equipment available "at franchisee's request" for a specified price.

5. Of 440 agreements inspected, 219 required Lumdogs and Lumburger mix to be purchased from Lums. The Abercrombie's agreements did not, however, impose such a requirement.

6. Margaret Abercrombie stated in her deposition that if they desired to make a supply change they made it. As an example, the Abercrombies changed bread suppliers in Jacksonville, and in Cocoa used Coca-Cola instead of Pepsi-Cola. (Mrs. Abercrombie's deposition, October 7, 1971, pp. 89–109).

tractual requirements.[7] Accordingly, while the Court in *Chicken Delight* could conclude that the standard form franchise agreement was the "focal point" of the allegedly illegal acts and therefore established a "common nucleus of operative facts" permitting class treatment (271 F.Supp. at 726), that conclusion is not permissible here.[8] Here proof of the tie-ins, if they exist, must come from an examination of each individual franchisee's dealings with Lum's. As discussed below, this is a matter of individual proof.

█ Plaintiffs' argument [Br. p. 95] that the common question of law or fact herein are "the questions going to the existence or non-existence of defendants alleged conspiracy to restrain trade, to lessen competition, to monopolize and to attempt to monopolize" does not reach the real issue here.[9] Whether or not such a conspiracy existed, the restraint of trade which must be proven in a tying case is an agreement, express or implied, between *buyer and seller* whereby the latter "sell[s] one product but only on the condition that the buyer also purchases a different (or tied) product . . . ." Northern Pacific R. Co. v. United States, *supra*, 356 U.S. at p. 5, 78 S.Ct. at p. 518. Proof of a "conspiracy" as suggested by plaintiffs would not establish the requisite agreement between buyer and seller, the gravamen of this case.

█ Plaintiffs also urge that the existence of an illegal tying arrangement may be shown not only by evidence of an express agreement but also through conduct extrinsic to an agreement. Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). In order to establish an illegal tying arrangement arising from business conduct, franchisees must prove that they were coerced, not merely persuaded, into purchasing the products at issue here. See Ford Motor Co. v. United States, 335 U.S. 303, 316–320, 69 S.Ct. 93, 93 L.Ed. 24 (1948). As the Court stated in American Mfrs. Mutual Ins. Co. v. ABC–Paramount Theatres, 446 F.2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972).

"[T]here can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice."

Such proof will necessarily vary from franchisee to franchisee. If the Abercrombies were to establish that they made forced purchases it would not necessarily follow that other franchisees were similarly coerced.[10] Thus, while

---

7. In *Chicken Delight* the Court stated (Siegel v. Chicken Delight, Inc., 9 Cir., 448 F.2d 43, 46):
   "The restraints in question are Chicken Delight's contractual requirements that franchisees purchase certain essential cooking equipment, dry-mix food items, and trade-mark bearing packaging exclusively from Chicken Delight as a condition of obtaining a Chicken Delight trade-mark license."

8. It is pertinent to note that the class procedure was not applied in *Chicken Delight* as to issues which did not arise from the express requirements. Thus, the Ninth Circuit reversed the District Court's inclusion of the "pricing" issue stating:
   "The Court believes that the determination of such issue would involve significantly different evidence and separate factual determinations as to each separate franchisee and that to impose such a burden in this case would be inconsistent with the basic salutary provision of Rule 23, Fed.R.Civ.P." (412 F.2d at 831).

9. If this were so, merely stating the "common" issue in terms of the statutory language would make every antitrust case a class action. As the Advisory Committee has stated, however, "[p]rivate damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions". Advisory Committee Notes to 1966 Amendments to Rule 23, 39 F.R.D. 73, 103 (1966).

10. Plaintiffs have argued that proof that Lum's received a commission or rebate on the sales of a product to its franchisees would create a class-wide issue of liability citing the so-called TBA cases [e. g., F.T.C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968)] which

the Abercrombies may have purchased equipment from Lum's, it appears that other Lum's franchisees purchased none.[11] Franchisees may have purchased items from defendants for a variety of reasons ranging from convenience, to attractiveness of the product, to, as the Abercrombies claim, coercion. Determination of the issue requires separate, distinct and individual, not common, proof.

Plaintiffs' claims concerning leasing arrangements similarly give rise to individual issues. Any claim that lease provisions which permit cancellation for breach of the franchise agreement could be applied so as to coerce franchisees in the operation of their restaurants would necessitate a review of how the provision was administered as to each franchisee who claimed he was coerced thereby. Any claim of a tie-in arising from lease guarantees, which are not mentioned in plaintiffs' franchise agreements, would also require examination of the particular dealings of each franchisee with the defendants.

The issue being coercion, the Court finds the reasoning in Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970) persuasive. There, the plaintiff dealer sought to represent a proposed class of Shell dealers, claiming that Shell had compelled its dealers to buy certain products in order to maintain their dealership status. In denying the class action motion, the Court held:

"There is as yet no per se rule of law which would automatically put a dominee who buys from a dominor in

a damage position; in between the relation of dominance and liability is a question of fact—persuasion v. coercion. As applied to 140 dealers, there are 140 questions of fact.

\* \* \* \* \* \*

"Our conclusion is therefore that the overall predominating questions presented by the plaintiff's claim are questions of fact and while the same questions of fact exist with respect to the claims of any other member of the class, a conclusion as to one member is not common or determinative, or even relevant when the question arises with respect to another member. The "predominating" questions are individual ones and not common." (50 F.R.D. at 200).

See also Morris v. Burchard, 51 F.R.D. 530 (S.D.N.Y.1971).

Here, as in *Lah,* the plaintiffs' proof as to coercion (i. e., liability) is "not common or determinative, or even relevant" when the question arises concerning another member of the purported class. Questions common to the class do not predominate in this suit over questions affecting only individual members (Rule 23(b) (3)) and, therefore, the class procedure is not appropriate here. As was stated in Denver v. American Oil Co., 53 F.R.D. 620 (D.Colo.1971).

"If the issues as to liability differ from proposed class member to proposed class member, there should be no class, because, then, the predominance of common factual and legal issues test is not met." (53 F.R.D. at p. 629)[12]

---

involved claims under the Federal Trade Commission Act. But, in the absence of coercion, receipt of such a commission does not resolve the question of antitrust liability. Lee National Corp. v. Atlantic-Richfield Co., 308 F.Supp. 1041 (E.D. Pa.1970), and Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir. 1972).

11. 79 franchisees did not purchase the equipment package from Lums or a subsidiary thereof.

12. Compare antitrust cases involving matters such as price fixing [e. g., In re Antibiotic Antitrust Actions, 333 F.Supp. 267 (S.D.N.Y.1971)] with cases where the

liability asserted varies depending upon the relationship between the defendant and each member of the class [e. g., Denver v. American Oil Co.; Gaines v. Budget Rent-A-Car Corp. CCH Trade Reg. Rptr. ¶ 73,860 (N.D.Ill.1972]. Similarly, compare securities cases based upon ascertainable misrepresentations in a written prospectus [e. g., Korn v. Franchard Corp., 456 F.2d 1206 (2d Cir. 1972)] with cases in which the misrepresentations alleged were made orally and could accordingly vary [E. g., Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y. 1968)].

From all the foregoing it is also apparent that "the difficulties likely to be encountered in the management" of this case as a class action would be extreme. This factor weighs heavily in determining whether the class action device is superior. (Rule 23(b) (3)). The individuality of the proof required would cause this suit to degenerate at trial into multiple lawsuits separately tried, exploring the relationships between each of over 400 members and the defendants on numerous alleged ties.

There were 127 general releases given over the course of the operations of Lum's when Lum's bought back franchised stores. Plaintiff contends they did not intend to release this particular claim when they sold a store back. Ergo, another issue of fact is raised requiring examination of the intent of each of 127 parties who executed such a release. Indeed, the existence of the plaintiffs' claim could well be submerged in the welter of possibly conflicting, contradictory and disparate claims by other franchisees, each vying for its full share of judicial attention. The Court sees no superiority to other available methods in such an omnibus, time-consuming and unnecessary procedure.

As previously noted, there is one exception to the absence of express purchasing provisions in the Lum's franchise agreements. 219 franchisees expressly agreed to purchase their requirements of "Lumdogs" and "Lumburger" mix from defendants. No such provision, however, is contained in any of the agreements executed by plaintiffs. Rule 23(a) provides "one or more members of a class" may represent other class members. Case authorities have consistently held that a plaintiff may not represent a class of which he is not a member. *E. g.*, Hall v. Beals, 396 U.S. 45, 48–49, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969); Hamer v. Campbell, 358 F.2d 215, 219 (5th Cir.), cert. denied, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966); Carroll v. Associated Musicians of Greater New York, 316 F.2d 574 (2d Cir. 1963); Syna v. Diners Club, Inc.,

49 F.R.D. 119, 121 (S.D.Fla.1970). Plaintiffs thus can not represent a group of franchises who might assert a claim based on the aforesaid provisions. Plaintiffs are not members of such a possible class.

Plaintiffs' failure to meet the class membership test of Rule 23 is also apparent in a variety of other areas where, admittedly, they do not possess the claims which they seek to assert on behalf of the class. Thus they claim that all franchisees were subject to illegal tie-ins concerning fixtures, signs, supplies, restaurant sites and equipment repurchases. Yet plaintiff bought eight of nine signs from private sources. In addition, did not object to plaintiff's selection of restaurant sites; indeed, the Abercrombies themselves located seven of their nine sites. The Abercrombies have also admitted that the equipment repurchase provision, about which they complain on behalf of themselves and the class, was not applied in the one instance where one of their franchises was terminated. Finally, plaintiffs have conceded that after the supplies stocked at the opening of their stores were used, they were free to purchase replacements from vendors of their own choosing. Plaintiffs are not members of the class they seek to represent *A fortiori*, they can not "fairly and adequately protect the interests" of that class, as required by Rule 23(a) (4). Hinson v. Monks, *supra*. *Cf.* Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26 (S.D.N.Y.1972). Indeed, this situation emphasizes the wisdom of the class membership requirement; it would be manifestly unfair to allow "representative" plaintiffs to bind an entire class on claims which they admittedly do not themselves possess.

Plaintiffs incorrectly suggest that creation of subclasses will remedy this problem. Plaintiffs can not properly represent a "subclass" of which they are not members any more than they can represent an overall class to which they do not belong. Rule 23(c) (4) (B) provides that each subclass created is itself to be treated as a class and that the

provisions of Rule 23 are to be "construed and applied accordingly". Thus, membership by the putative representative is required therein. See Wolfson v. Solomon, 54 F.R.D. 584 (S.D.N.Y.1972) where the Court stated:

"If the plaintiffs did not belong to both classes they could not be representative of both."

Plaintiffs also argue that any such deficiencies in their case can be overcome by a member's "opting out" (Rule 23(c) (2)) if he feels his case is better or different. However, the prerequisites set forth in Rule 23(a) and (b) must first be satisfied before the notice provisions of 23(c) even become applicable. Free World Foreign Cars, Inc. v. Alfa Romeo, *supra*, 55 F.R.D. at p. 29. As discussed above, those prerequisites have not been satisfied here.

Finally, there is no apparent necessity for the maintenance of this case as a class action. Denial of the class action will in no way preclude litigation of the plaintiffs' claim, the two individual and nine corporate plaintiffs here seek $1,-500,000 in treble damages, as well as attorneys' fees. As Judge Weinfeld said in the *Alfa Romeo* case, this "is a reliable forecast of vigorous prosecution of this action" (p. 31).

Plaintiffs, of course, do not possess an inherent right to represent a class of franchisees. See Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc., 455 F.2d 770 (2d Cir. 1972). Nor do the interests of Lum's other franchisees require that plaintiffs be permitted to proceed on their behalf. There is no reason to assume that any other franchisee who believes that the defendants have violated the antitrust laws is not capable or willing to bring his own action to vindicate his rights.[13] Alfa Romeo, *supra*, 55 F.R.D. at p. 29. In light of the plaintiffs' claims, the claims of other franchisees would, presumably, not be "too small to justify separate litigation". Korn v. Franchard, 456 F.2d 1206, p. 1214 (2d Cir. 1972).

While the Court recognizes that Rule 23 constitutes a significant contribution to federal procedure, a measured approach to its application is nevertheless required. It appears that the initial enthusiasm for the Rule has been tempered by recognition of the practical problems inherent in its use. Free World Foreign Cars, Inc. v. Alfa Romeo, *supra;* Schaffner v. Chemical Bank, *supra;* Ratner v. Chemical Bank, *supra;* Gaines v. Budget Rent-A-Car, *supra;* Gerlach v. Allstate Ins. Co., 338 F.Supp. 642 (S.D. Fla.1972); Denver v. American Oil Co., *supra;* see Hackett v. General Host Corp., 455 F.2d 618 (3rd Cir. 1972).

Here, even measured by the most liberal standards, class treatment does not lie. Common issues do not predominate; individual issues abound. Plaintiffs' membership in the class they purport to represent is deficient as to a number of their claims and they are not representative. Finally, considerations of judicial efficiency and economy, both of which are embodied in the requirement of manageability, dictate that class treatment would not be superior to other available methods of adjudication.

## FINDINGS AND ORDER

Based upon all the foregoing, this Court finds that:

(1) The questions of law and fact common to the members of the proposed class or classes do not predominate over the questions affecting only individual members thereof [Rule 23(a) (2), 23(b) (3)];

(2) Plaintiffs are not proper representatives of the proposed class or classes of claimants which they

---

13. The statute of limitations would be no bar to those franchisees who could show that they in fact relied on the pendency of this case as a class action. Buford v. American Finance Co., 333 F.Supp. 1243 (N.D.Ga.1971); see Ratner v. Chemical Bank, *Supra* at 1017, n. 4; Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 460–461 (E.D.Pa.1968). As to any others, Rule 23 obviously was not designated to revive stale claims.

seek to represent upon claims of illegal tie-ins relating to fixtures, signs, supplies, restaurant sites, equipment repurchases and express purchasing provisions for certain meat products, and plaintiffs can not fairly and adequately protect the interests of the members of the proposed class or classes concerning such claims [Rule 23(a), 23(a) (4)];

(3) A class action here would not be superior to other available methods for the fair and efficient adjudication of the controversy [Rule 23(b) (3)].