**CAPITAL TEMPORARIES, INC. OF HARTFORD et al.**

v.

**The OLSTEN CORPORATION.**

Civ. No. 14749.

United States District Court, D. Connecticut.

Oct. 11, 1973.

Philip S. Walker, Robert P. Knickerbocker, Jr., Ralph C. Dixon, Hartford, Conn., for plaintiffs.

Irving S. Ribicoff, Louise H. Hunt, Matthew J. Forstadt, Hartford, Conn., for defendant.

RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT ON COUNT FIVE OF PLAINTIFFS' COMPLAINT

BLUMENFELD, Chief Judge.

On September 17, 1965, Constantine T. Zessos (Zessos) entered into a franchise agreement with the Olsten Corporation (Olsten), which licenses employment service businesses to operate under its trademark throughout the United States and Canada. Pursuant to this contract,[1] Zessos was permitted to use the Olsten trademark and received supplies and instruction in conducting the operation of a "white-collar" (largely secretarial) employment service; in return he agreed to pay $6,000 plus five per cent of his gross billing as franchise fees to the defendant. The agreement gave Zessos the right to open an Olsten's office in Hartford and Middlesex counties;[2] a "Rider" signed the same day gave him the right to operate in New Haven as well, provided he opened an Olsten's office there within eighteen months of the first billing made by the Hartford operation.[3]

In addition, Paragraph 2 of the agreement provided:

"The grant of the license hereunder includes the right of the LICENSEE to use the trade mark and name HANDY ANDY LABOR. All 'blue collar' personnel shall be supplied by a division of the LICENSEE designated as HANDY ANDY LABOR commencing six (6) months from the date hereof. For the purposes of standards and rate of franchise fee, the total of all billings from whatever source shall be included.

The division shall be known as HANDY ANDY LABOR, a division of OLSTEN'S OF GREATER HARTFORD, INC. At the option of the LICENSEE, such division may be operated as a separate corporate entity. In such event, it shall be designated as HANDY ANDY LABOR OF GREATER HARTFORD, INC. In either event, separate bookkeeping shall be kept for the 'blue collar' division. In the event the LICENSEE incorporates, all of the provisions as set forth in paragraph 23 shall apply."

1. This document is Exhibit A, and is attached to the amended complaint.

2. It is undisputed that Zessos never conducted any operations in Middlesex County.

3. If he failed to meet this deadline, the agreement provided that $2,500 of the initial franchise fee would be returned to him.

The Rider makes no mention whatever about Handy Andy operations in New Haven.

Zessos claims that under the contract he was compelled to open a blue-collar Handy Andy employment service in order to receive the Olsten's white-collar franchise he desired.[4] He asserts that Olsten, in yoking the two operations and refusing him the choice of taking the one he wanted by itself, enforced a tying arrangement (tie-in) unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.[5] The defendant denies that either its conduct or the contract itself obligated or compelled Zessos to operate a Handy Andy. In other words, Olsten argues that while Zessos was afforded the opportunity to operate the blue-collar agency if he chose to do so, he was *required* only to run the Olsten's office and pay the franchise fees. Both parties have moved for summary judgment on their claims.[6] Fed.R.Civ.P. 56. Before examining their conflicting contentions as to the construction of the contract and its attendant circumstances, it is appropriate to review the antitrust principles pertinent to the dispute.

## I.

### *The Law Concerning Tie-ins*

 Under the Sherman Act, certain business practices are considered so blatantly at odds with the statute's policy of furthering competition that they are considered per se unreasonable[7] and therefore "illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Included on this roll of condemned practices are price fixing, group boycotts, market division and, if certain prerequisites are met, tying arrangements. *Id.* at 5, 78 S.Ct. 514. This practice "may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any

4. Zessos operated a Handy Andy in New Haven from September, 1969 until December, 1970. Olsten Aff., paras. 38–39.

5. 15 U.S.C. § 1 provides:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further*, That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

6. This antitrust claim is but one count in this bitter litigation. The amended complaint also alleges causes of action for breaches of contract and warranty, unfair competition and abuse of process.

7. Despite the Act's sweeping language, note 5, *supra*, it was interpreted early in its history to prohibit only "unreasonable" restraints of trade. See Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

other supplier." [8] *Id.* at 5–6, 78 S.Ct. at 518. Since "[t]ying arrangements serve hardly any purpose beyond the suppression of competition," Standard Oil Co. of California v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L. Ed. 1371 (1949), they "fare harshly under the laws forbidding restraints of trade." Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 606, 73 S. Ct. 872, 879, 97 L.Ed. 1277 (1953).

■ For a tie-in to fall under the per se prohibition of the Sherman Act, "the seller must have 'sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . .'" United States v. Loew's, Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 102, 94 L.Ed. 1380 (1962), quoting Northern Pac. R. Co. v. United States, *supra*, 356 U.S. at 6, 78 S.Ct. 514. In addition, "a 'not insubstantial' amount of interstate commerce [must be] affected." Northern Pac. R. Co. v. United States, *supra*, 356 U.S. at 6, 78 S.Ct. at 518. See also Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 501–504, 89 S. Ct. 1252, 22 L.Ed.2d 495 (1969).

## A. The Requirement of Economic Power

■ While some commentators have suggested that the Supreme Court has implicitly abandoned the requirement of economic power, see The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 235 (1969), that proposition is not supported by case law. Rather, the Court has made the test progressively more easy to satisfy—compare Times-Picayune Pub. Co. v. United States, *supra*, with Fortner Enterprises v. United States Steel Corp., *supra*—and in certain circumstances permits the requisite economic power to be presumed. Foremost among the circumstances creating the presumption is when a barrier to competition is posed by the law, as when a product is protected by patent or copyright. See Fortner Enterprises v. United States Steel Corp., *supra*, 394 U.S. at 505 n. 2, 89 S.Ct. 1252; United States v. Loew's Inc., *supra*, 371 U.S. at 45, 83 S.Ct. 97. Soon after the *Loew's* case, this Circuit included a trademark or franchise license within the category of tying products. Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. granted, 379 U.S. 885, 85 S.Ct. 158 (1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364 (1965). But the majority in *Susser* refused to hold that the requisite economic power could be presumed from the existence of the trademark. See 332 F.2d at 519. They applied a "market dominance" standard in finding that the defendant in *Susser* lacked the requisite power; by rejecting that standard in Fortner Enterprises v. United States Steel Corp., *supra*, 394 U. S. at 502–506, 83 S.Ct. 1252, the Supreme Court vindicated Chief Judge Lumbard's dissenting opinion in *Susser*. See 332 F.2d at 513.[9]

■ It must be emphasized that *Fortner* does not hold that the mere existence of economic power in a seller is enough to meet the first criterion needed to establish the illegality of a tie-in. The economic power must not simply exist; it must be used. "[T]here can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice." Amer. Mfrs. Mut. Ins. Co. v. Amer. B–P Theatres, 446 F.2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S. Ct. 737, 30 L.Ed.2d 752 (1972). See also, Belliston v. Texaco, Inc., 455 F.2d 175, 183–184 (10th Cir. 1972), cert. denied, 408 U.S. 928, 92 S.Ct. 2494, 33 L. Ed.2d 341 (1972); Abercrombie v. Lum's Inc., 345 F.Supp. 387, 391 (S.D. Fla.1972).

8. The Court added a footnote at this point which is relevant to the present case:

"Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." 356 U.S. 1, 6 n. 4, 78 S.Ct. 514, 518.

9. For a similar analysis of the impact of *Fortner* on the continued vitality of this aspect of *Susser*, see Siegel v. Chicken Delight, Inc., 448 F.2d 43, 50 n. 7 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 1173, 31 L.Ed.2d 232 (1972).

## B. Impact on Interstate Commerce

■ As it has eased plaintiff's burden of proving the seller's market power, so has the Supreme Court liberalized its view of what proof will satisfy the requirement of a "not insubstantial" burden on the affected interstate commerce. In *Fortner* the Court sharply curtailed the market-share analysis that had been used by several lower courts, and stated that "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie." 394 U.S. at 501, 89 S.Ct. at 1258. It emphasized the role of the private antitrust plaintiff in "vindicat[ing] the important public interest in free competition," and thus refocused inquiry on the total impact of the practice under attack. "[T]he relevant figure is the total volume of sales tied by the sales policy under challenge," not the plaintiff's portion of that total. 394 U. S. at 502, 89 S.Ct. at 1258. However, the Court's relaxation of a plaintiff's burden of proof on this point has not dispensed with the need for him to make some showing that the defendant's acts have in fact had some effect on interstate commerce.

## II.

*Plaintiff's Motion for Summary Judgment*

It is apparent from the foregoing review of tie-in doctrine that the plaintiff is contending for a novel extension of its reach. In defining the evil proscribed, all the cases talk about the power of sellers to force buyers to *purchase products* they might choose not to obtain from the seller if the tying arrangement did not obstruct free competition. See generally Note, The Logic of Foreclosure, 79 Yale L.J. 86 (1969). This action does not present that situation.

Unlike the plaintiffs in Susser v. Carvel Corp., *supra*, who were required to buy flavoring, topping and cones along with the franchise name, or the franchisees in Siegel v. Chicken Delight, *supra*, who had to buy spices, cooking equipment and packaging supplies from the defendant, Zessos was not constrained to pay Olsten any money whatever for the Handy Andy license. As appears from the plain language of the contract (para. 2), he simply received the right to use the Handy Andy trademark along with the Olsten name. The defendant earned no income from that grant; thus defendant did not, in any normal sense of the word, "sell" plaintiff rights to use the Handy Andy trademark.[10]

Neither was the Handy Andy license a product in the sense usual to tie-in cases. Generally the tying and tied products are jointly necessary or useful to the buyer or his business, or are similar in character. Here there was no necessary connection between the two; Zessos did not need the right to use the Handy Andy license in order to operate the Olsten's employment service. Moreover, Handy Andy was an entirely separate business,[11] operating in a completely different market.

Thus it would seem that even assuming *arguendo* that the licensing agreement compelled Zessos to open a Handy Andy, a long conceptual leap would be needed to analogize that obligation to a traditional tie-in. However, a ruling on plaintiff's motion does not require consideration whether such a leap would be consistent with existing tie-in law, or whether it would be justified in this

10. Plaintiff argues that the defendant had a financial interest in his entrance into the blue-collar field, because its franchise fees were based upon plaintiff's gross billings. Thus defendant stood to make money even from operations such as the New Haven Handy Andy which incurred net operating losses. This simple truism does nothing to establish the existence of a tying arrangement. If it did, nearly all franchise agreements would be held to violate the antitrust laws.

11. Paragraph 2 of the contract required the plaintiff to maintain separate bookkeeping for each operation.

case. The principles enunciated in Amer. Mfrs. Mut. Ins. Co. v. Amer. B-P Theatres, *supra,* command that the motion be denied. The record is utterly devoid of evidence that Zessos was in any way coerced or compelled to open a Handy Andy office. To state the crucial point another way, there is no indication whatever that Zessos attempted to free himself from the supposed burden of having to open a Handy Andy office, or that he bargained with Olsten for a white-collar franchise alone.

In his affidavit, Zessos stated:

"9. That my attorney pointed out that I had not opened a Handy Andy office in accordance with the terms of the agreement and suggested that I obtain a waiver of my failure to comply in this regard.

10. That I thereafter discussed my agreement with William Olsten, the defendant's President, who initially agreed that I could open a Handy Andy office at a time of my selection without an initial license fee.

11. That thereafter Mr. Olsten changed his position and insisted that a definite deadline for opening a Handy Andy office be inserted into the August 1969 amendment to the agreement of September 17, 1965. This date was December 31, 1969. (See Exhibit 3 to defendant's Brief: 'Handy Andy—Bill wants me to open no later than December 31, 1969' and

my April 18, 1969 letter annexed as Exhibit 1, hereto).

12. That although I did not for business reasons want to open a Handy Andy office during the time period 1968-1969, I was told by Mr. Olsten that I must do so because 'it was in my contract' and was further promised that the Olsten organization would give full support to such an office."

It is clear that this controversy between the parties was over a question of time—the deadline to be imposed on Zessos' chance to begin Handy Andy operations. It had nothing to do with any supposed condition imposed by Olsten that he *must* enter the blue-collar field.[12] Thus even if the facts relating to this issue are disputed, they are not material to the question of whether Olsten exercised economic power to force Zessos to begin operations; the dispute is merely about who included the time limit on his entrance into the blue-collar field in the 1969 negotiations. A reasonable time limitation on an opportunity previously extended cannot be translated into an exercise of economic power; there is no requirement that an offer remain open perpetually under peril of the antitrust laws.

I conclude from the evidence presented by both parties in the form of affidavits and depositions that it is beyond factual dispute that the defendant never

12. Any suggestion that this correspondence represented the exercise of compulsion by the defendant is belied by contemporaneous notes in Zessos' own handwriting, found in Exhibits 2 and 3. In May of 1968, Zessos received a letter from his attorney, which stated, *inter alia,*

"2. Handy Andy Labor should have commenced in March of 1966. You should extend the date or have it eliminated. The agreement should also provide that no additional license fee is to be charged for Handy Andy."

Just below this printed paragraph is a note in Zessos' hand: "Bill & I have gentlemen's agreement—no fee—no time limit." Attached to a copy of this letter (Exh. 2) are two pages of Zessos' handwritten notes (Exh. 3), which apparently were sent, along with the

letter, to defendant's General Counsel in New York. (See Helweil aff., para. 5.) After writing again the above-quoted sentence which appears on the face of the letter, Zessos wrote:

"However, now that we're going public, please put it into contract. I'm certainly going to open another Olsten office everywhere I can.—Open Handy Andy & these office at my option.—*Dec. 31, 1969.*"

Since on a motion for summary judgment the movant has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party," Adickes v. S. H. Kress Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), Zessos' affidavit cannot be regarded as establishing coercion by the defendant.

exerted any economic pressure to compel the plaintiff to operate a blue-collar employment service franchise. I find, to the contrary, that the only dealings between the parties on the subject of Handy Andy came at the behest of the plaintiff, who sought an extension of time in which to begin such operations. To prevail in his motion for summary judgment, Zessos must establish that Olsten exploited its economic power to compel him, contrary to his wishes, to open a Handy Andy office. American Mfrs. Mut. Ins. Co. v. Amer. B–P Theatres, *supra*. Since the record is barren of evidence to support such a finding, the plaintiff's motion for summary judgment must be, and is hereby, denied.

### III.

■ The Supreme Court has repeatedly made clear that summary judgment motions dismissing antitrust claims are not generally to be granted. Fortner Enterprises v. United States Steel Corp., *supra*, 394 U.S. at 500, 505, 83 S.Ct. 1252 [citing Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962)]. However, this generally unfavorable attitude is not a blanket proscription, and does not preclude the granting of such a motion when it is plain that the allegedly unlawful practice simply does not exist, and that plaintiff's claim is without merit. *Cf.* Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973). This case presents such a situation.

The key provision of the contract, Paragraph 2, see p. 2, *supra,* simply granted the plaintiff the right to use the Handy Andy trademark. The Rider to the agreement, permitting Zessos to operate in New Haven, does not mention Handy Andy at all. Yet it was in New Haven that he opened his short-lived blue-collar operation; he never attempted to conduct that business in Hartford.[13] The only condition the contract imposed on Zessos was to *forbid* him to open a Handy Andy less than six months after the inception of the white-collar operation. Defendant explains this prohibition as a safeguard to prevent a "fledgling franchisee" from plunging into business too deeply without enough experience.[14] In view of the need of a corporation with nation-wide interests to protect its business reputation, this is certainly a credible explanation. As discussed earlier, plaintiff was informed by his attorney early in 1968 that the six months had long since passed,[15] yet he did not actually open a Handy Andy office until another year and a half went by, or almost exactly four years from the date he purchased the Olsten franchise. Neither the contract nor the relations between the parties revealed in the documents accompanying their motions suggests that the defendant pressured Zessos to begin the Handy Andy operation. What emerges from the evidence is a picture of a businessman who waited until he thought, mistakenly, that the right time had come for him to venture into a new field. There is nothing before the court to suggest that the defendant ever insisted, or plaintiff ever considered, that the operation of the white-collar franchises was dependent upon his entrance into the blue-collar market. Rather, the conclusion is unavoidable that, throughout the history of his relationship with the defendant, the plaintiff considered the blue-collar business "just another area that we could earn quite a bit of income, an area that the Olsten organization was expanding into." [16]

■ I find, therefore, that the white-collar and blue-collar franchises were entirely separate operations; that

---

13. Zessos' Deposition, p. 19.

14. The plaintiff admitted that he had no previous experience in the employment service industry. Zessos' Deposition, p. 13.

15. It is not readily apparent why Zessos and his then attorney interpreted the six months' limitation as a deadline. The plain language of the provision supports the statement of defendant's president that he did not so regard it. Olsten's Affidavit, paras. 33–36.

16. Zessos' Deposition, p. 25.

the plaintiff was never compelled to operate the latter in order to obtain the former; that he received the right to use the Handy Andy trademark along with his purchase of the Olsten franchise without payment of additional consideration. Construing as a matter of law the plain language of the contract, see Nat'l Utility Service, Inc. v. Whirlpool Corp., 325 F.2d 779, 781 (2d Cir. 1963), I hold that Zessos was in no way obligated to enter the blue-collar industry and that his only obligation under the contract was to fulfill its conditions with respect to the Olsten's white-collar franchise.

In light of these findings of fact and conclusions of law, I hold that there existed no tie-in between the white-collar and blue-collar franchises. No genuine issue of material fact precludes this conclusion of law; the matter is therefore properly subject to adjudication on motion for summary judgment. Fed.R. Civ.P. 56(c). The plaintiff's motion for summary judgment is denied; defendant's motion for summary judgment on the fifth count is granted. Judgment will enter dismissing the fifth count of the complaint.

So ordered.